DAVID A. BAHR (Oregon Bar No. 901990)
Bahr Law Offices, P.C.
1035 ½ Monroe Street
Eugene, OR 97402
(541) 556-6439
davebahr@mindspring.com

JENNIFER BEST (*pro hac vice*)
STEPHEN HERNICK (*pro hac vice*)
Friends of Animals, Wildlife Law Program
6041 S. Syracuse Way, Suite 250
Greenwood Village, CO 80111
(720) 945-9453
jennifer@friendsofanimals.org
shernick@friendsofanimals.org

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| **FRIENDS OF ANIMALS**,<br><br>   Plaintiff,<br><br>      *v.*<br><br>**HUGH MORRISON**, in his official capacity as the Regional Director of the United States Fish and Wildlife Service,<br><br>**THE UNITED STATES FISH AND WILDLIFE SERVICE**, an agency of the United States,<br><br>**BUREAU OF LAND MANAGEMENT**, an agency of the United States, and<br><br>**ANIMAL AND PLANT HEALTH INSPECTION SERVICE**, an agency of the United States,<br><br>   Defendants. | Case No. 3:24-cv-01928-AN<br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

First Amended Complaint

**INTRODUCTION**

1.      Friends of Animals brings this action to challenge the U.S. Fish and Wildlife Service's (FWS) unprecedented decision to kill hundreds of thousands of federally protected barred owls in Washington, Oregon, and northern California. Friends of Animals specifically challenges FWS's decision to move forward with this plan, its permit under the Migratory Bird Treaty Act (MBTA), and its analysis under the National Environmental Policy Act (NEPA) (collectively, the "Decision"). Other agencies have since adopted FWS's NEPA analysis and decided to implement barred owl removal, and Friends of Animals challenges those decisions as well. When referring to all agencies' decisions to implement barred owl removal, this Complaint will use the term "Lethal Management Program."

2.      The lethal management Decision comes after decades of FWS's delays and failures to protect needed habitat for spotted owls. The Decision ignores habitat management and instead pits similar owl species against one another. The alleged beneficiaries of the Decision are northern spotted owls and California spotted owls (collectively referred to as "spotted owls"). Barred owls are the target—and they are the scapegoat for FWS's mismanagement and unwillingness to better protect spotted owl habitat.

3.      Barred owls do not kill spotted owls. Rather, FWS is targeting barred owls for their adaptability and resilience. In fact, the two species are so similar that they occasionally breed and can have fertile hybrid offspring ("Hybrid owls"). When discussing the impacts of the Decision in this Complaint, references to barred owls include Hybrid owls.

First Amended Complaint                          2

4.      The lethal strategy that FWS authorized is to lure barred owls at night with bait or decoys and then shoot or trap the owls, killing approximately 450,000 barred owls over the next thirty years. Yet FWS acknowledges that barred owls will continue to coexist with spotted owls even after it kills 450,000 of them, so it is unclear what, if any, benefit this drastic and unethical slaughter will have or whether FWS will continue to kill barred owls in perpetuity.

5.      While continued and historical destruction of old growth forests that the spotted owl relies on is the main threat to the species, the lethal management strategy does nothing to address this threat or even ensure habitat remains protected in areas where barred owls are killed.

6.      The end game of this massive killing strategy is unclear. Studies have shown that killing barred owls did not significantly help spotted owl populations even when barred owls were removed from much smaller, manageable target areas.

7.      Underlying the Decision is the false premise that barred owls are an invasive species. But barred owls were not introduced to the Pacific Northwest by humans. Instead, FWS believes they migrated to the Pacific Northwest over a hundred years ago in response to changing climatic and geographic conditions.

8.      The Decision sets a dangerous precedent for any species that migrates and thrives in a changing environment.

9.      Not only is this plan alarming, it is also illegal. Such needless killing of protected wildlife is something that was never contemplated or authorized by the MBTA. FWS failed to offer any compelling justification for the take of hundreds of thousands of protected barred owls, as is required by law.

First Amended Complaint                              3

10. FWS relies on the fact that northern spotted owls are listed as threatened under the Endangered Species Act (ESA), but the ESA makes no mention of managing competition between species by killing large numbers of a protected species and does not authorize such an unprecedented plan.

11. Moreover, FWS violated the National Environmental Policy Act (NEPA) because it failed to explore reasonable alternatives and failed to take a hard look at the impacts of the proposed lethal management strategy. FWS crafted the purpose and need of the project so narrowly as to exclude any result other than the mass slaughter of barred owls.

12. While FWS intends to kill barred owls in many different areas, it is especially jarring that FWS also proposes to carry out this action in federally designated wilderness areas. The Wilderness Act mandates that FWS manage these areas in a limited way so that they are unaffected by humans. Yet FWS intends to intentionally disrupt the natural balance of species and to favor some owls at the mortal expense of others. The Wilderness Act forbids such a heavy-handed approach in these precious, pristine areas.

13. The Decision ignores the major reasons for the declining population of spotted owls, among them logging, other destruction of habitat, climate change, and inadequate protections from FWS itself. Instead, the Decision scapegoats barred owls for the decline of spotted owls, and ushers in a needless slaughter of hundreds of thousands of barred owls that will do little, if anything, to improve the plight of spotted owls.

14. The mass slaughter of barred owls under the Decision is additionally senseless because it will not change the outlook for spotted owls: they will still not be protected as endangered; their habitats will continue to be negatively affected by the

First Amended Complaint                              4

logging industry, human development, and climate change; and, because barred owls are so entrenched in the areas where FWS intends to kill them, spotted owls will always have to live alongside barred owls in these areas.

15.    The Decision will not help spotted owls in a significant way. That is borne out by the lackluster results from a previous experiment, in which FWS killed about 2,500 barred owls in the hope that this would prove a panacea to the continued decline of spotted owls. But the experiment proved to be a failure.

16.    To be clear, the Decision is illegal whether or not it would help spotted owls. But the fact that it will not help spotted owls, whereas additional actions available to FWS would better conserve spotted owls, demonstrates just how disastrous the Decision is.

**PARTIES**

17.    Plaintiff FRIENDS OF ANIMALS is a nonprofit international advocacy organization incorporated in the State of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living and domestic animals. Friends of Animals seeks to dispel the myth that conservation depends on killing or exploiting animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine *ActionLine*, its website, and other reports. Friends of Animals has published articles and information advocating for the protection of wild species so that they can live unfettered in their natural habitats.

18.    Friends of Animals commented on the Draft Environmental Impact Statement (EIS) and the permits related to the barred owl removal experiment urging FWS

First Amended Complaint                    5

to consider additional alternatives and take a hard look at the environmental effects of the proposed action and alternatives.

19. Friends of Animals and its members are harmed by FWS's lethal management strategy and the Decision. Many of Friends of Animals' members are avid birdwatchers and enjoy observing barred owls. Other Friends of Animals members are bird rehabilitators who have enjoyed rehabbing and releasing barred owls in the past and hope to do so again. Moreover, Friends of Animals' members enjoy recreating in and around the areas covered by the lethal management strategy. The Decision reduces the recreational value of these areas for members by ruining the aesthetic beauty, sanctity, peacefulness and serenity of these forest habitats. The Decision decreases the likelihood that these members will see and observe barred owls and increases the likelihood that they will see and hear the killing of owls and dead, wounded, or dying animals.

20. Friends of Animals members live in and around and have plans to visit areas, including wilderness areas, where FWS intends to kill barred owls. These members will not be able to fully enjoy their visits because the reasons that they recreate in these areas—to enjoy the natural and undisturbed beauty and wilderness of such areas— are destroyed by the misinformed wildlife policies aimed at killing barred owls.

21. Other Friends of Animals members include ethicists and philosophers who are harmed because FWS did not consider the ethical implications of the Decision. They would have participated had FWS considered the ethical implications of the Decision. They are concerned about the effects of the Decision for barred owls and other species.

First Amended Complaint                              6

22.     Defendant HUGH MORRISON is the Regional Director of the United States Fish and Wildlife Service Pacific Region. Defendant Morrison oversees the actions of FWS and signed the final record of decision approving the lethal management strategy.

23.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the United States Department of the Interior. FWS approved the Decision and obtained the permits authorizing the shooting of barred owls. FWS includes the Service Migratory Birds and Habitat Program ("FWS Birds"), the division of FWS that granted the MBTA permit at issue in this case. FWS is responsible for complying with all federal laws and is an agency within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 701.

24.     Defendant BUREAU OF LAND MANAGEMENT (BLM) is an agency with the United States Department of the Interior. BLM issued a decision adopting FWS's EIS for the Barred Owl Management Strategy in order to implement removal of barred owls on BLM lands in western Oregon.

25.     Defendant ANIMAL AND PLANT HEALTH INSPECTION SERVICE (APHIS) is an agency within the United States Department of Agriculture. APHIS issued a decision adopting FWS's EIS for the Barred Owl Management Strategy in order to implement removal of barred owls in Oregon.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and 5 U.S.C. §§ 701-706 (APA).

27.     This Court has authority to grant Plaintiff's requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (APA).

First Amended Complaint                     7

28.     An actual, justiciable controversy exists within the meaning of the Declaratory Judgment Act between Plaintiff and Defendants.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. FWS's Regional Director of the Pacific Region signed the final decision authorizing the take of barred owls under the MBTA and the lethal barred owl management strategy. The Pacific Region office is located in Portland, Oregon. Assignment in this judicial division is proper for the same reasons.

## LEGAL FRAMEWORK

### A. The Administrative Procedure Act

30.     The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, authorizes judicial review of agency actions. 5 U.S.C. § 702.

31.     The APA requires that courts "hold unlawful and set aside" actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "unsupported by substantial evidence," among other things. 5 U.S.C. § 706.

32.     The APA establishes required procedures for agency rule making.

33.     The APA defines "rule making" as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).

34.     The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4).

First Amended Complaint                    8

35.     The APA requires that a notice of proposed rule making be published in the Federal Register, including the terms or substance of the proposed rule. 5 U.S.C. § 553(b).

36.     In addition to providing notice, the APA requires that agencies allow the public to participate in a rule making by providing an opportunity for public comments. 5 U.S.C. § 553(c).

### B.  The National Environmental Policy Act

37.     The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, is our nation's basic charter for environmental protection. 40 C.F.R. § 1500.1(a).[1]

38.     Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their decisions before acting. Second, Congress sought to provide the public with a statutory means for being informed about, and commenting on, the environmental impacts of proposed agency actions.

39.     Before an agency can undertake a federal action that significantly affects the quality of the human environment, NEPA mandates that the acting agency prepare a detailed environmental impact statement (EIS) including "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided

---

[1] In response to Executive Order 14154, § 5(a), 90 Fed. Reg. 8353, 8355 (Jan. 20, 2025), CEQ issued an interim final rule to rescind its NEPA regulations, 90 Fed. Reg. 10610 (Feb. 25, 2025). The rescission rule states that "agencies should, in defending actions they have taken, continue to rely on the version of CEQ's regulations that was in effect at the time that the agency action under challenge was completed." *Id.* at 10614. This complaint therefore cites to the version of CEQ's NEPA regulations that were in effect on August 22, 2024, when FWS issued its Decision. *See* National Environmental Policy Act Implementing Regulations Revisions, 89 Fed. Reg. 35442 (May 1, 2024).

First Amended Complaint                    9

should the proposal be implemented, [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

40.     An agency must consider reasonable alternatives to the proposed action and "for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination." 40 C.F.R. § 1502.14(a).

41.     In an EIS, a federal agency must (1) "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action; (2) identify and disclose to the public all direct, indirect, and cumulative impacts of the proposed action and each reasonable alternative; and (3) consider possible mitigation measures to reduce such impacts to the environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.1(g), 1502.14–1502.16.

42.     Cumulative impacts include impacts that "result [ ] from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes  such other actions." 40 C.F.R. § 1508.1(g)(3). The acting agency must undertake its NEPA analysis with the goal of making sure that "individually minor but collectively significant" actions are properly analyzed. *Id.*

43.     NEPA requires that an EIS take a "hard look" at the environmental consequences of a proposed action. *City of Los Angeles v. FAA*, 63 F.4th 835, 849 (9th Cir. 2023).

44.     To take a hard look, an EIS must contain a reasonably thorough discussion of any significant aspects of likely environmental impacts. *Id.*

First Amended Complaint                    10

45. An EIS violates the "hard look" standard when it relies on incorrect assumptions or data. *Id.*

### C. The Migratory Bird Treaty Act

46. The Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 706 *et seq.*, was originally passed by Congress and signed into law by President Wilson in 1918.

47. The MBTA serves to implement the commitments made by the United States in four bilateral treaties for the protection of migratory birds.

48. The original treaty upon which the MBTA was passed was the Convention for the Protection of Migratory Birds, signed with Great Britain in 1916 on behalf of Canada (the "1916 Convention").

49. The purpose of the 1916 Convention was to protect the many species of birds that traverse certain parts of the United States and Canada in their annual migrations.

50. The primary motivation for negotiation of the 1916 Convention, and the subsequent passage of the MBTA to enforce that convention, was to stop the "indiscriminate slaughter" and insure the preservation of migratory birds.

51. The United States entered into a convention with Mexico in 1936 to protect migratory birds "whatever may be their origin."

52. The United States entered into a convention with Japan in 1972 to protect migratory birds as natural resources of great value.

53. The United States entered into a convention with what was then the Soviet Union (now Russia) in 1976 to protect migratory birds as natural resources of great value.

First Amended Complaint                    11

54.     The conventions between the United States and Canada, Mexico, Japan, and Russia (collectively "Conventions") protect designated migratory birds and prohibit the take of those birds except for in specified limited circumstances.

55.     The conventions with Canada, Japan and Russia specify the means that should be used to protect migratory birds, including protecting their habitat.

56.     The Soviet Convention states that the United States shall "provid[e] for the rehabilitation of the habitat" and "undertake measures necessary to protect and enhance the environment of migratory birds and to prevent and abate the pollution or detrimental alteration of that environment."

57.     The Japanese Convention states that parties shall "seek means to prevent damage to such birds and their environment."

58.     The Canadian Convention states that the means to pursue the purpose of the Convention may include "to provide for and protect habitat necessary for the conservation of migratory birds."

59.     The Conventions do not authorize the take of protected migratory birds if one species merely outcompetes other species.

60.     The MBTA implements all the Conventions.

61.     The MBTA makes it illegal to "pursue, hunt, take, capture, kill, attempt to take, capture, or kill . . ." any migratory bird or "any part, nest, or egg of any such bird . . . , by any means or in any manner," except as permitted by valid permit issued pursuant to regulations. 16 U.S.C. § 703.

62.     The MBTA does not authorize the take of protected migratory birds on the basis that they outcompete other species.

First Amended Complaint                    12

63.     The MBTA also prohibits the use of baiting to take migratory game birds. 16 U.S.C. § 704 (b).

64.     Any regulations promulgated to implement the MTBA that would allow an exemption from the MBTA take prohibition must be compatible with all four Conventions. *See* 16 U.S.C. § 704.

65.     The 2005 Consolidated Appropriations Act amended the MBTA to limit protection under the Act to birds that are native to the United States. 16 U.S.C. § 703(b).

66.     The amendments define "Native to the United States" as "occurring in the United States or its territories as the result of natural biological and ecological processes." 16 U.S.C. § 703(b)(1).

67.     Landscape changes caused by agriculture and other forms of human development are considered natural ecological processes.

68.     Barred owls are native to the United States and protected under the MBTA. 50 C.F.R. § 10.13(c)(1).

69.     Special purpose permits are only authorized for purposes that are otherwise not covered by the standard form permits.

70.     An applicant for a special purpose permit must make "a sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification." 50 C.F.R. § 21.95.

71.     The regulation authorizing special purpose permits is not a general catchall, but a narrow exception to the MBTA's general prohibition on taking migratory birds. *See Turtle Island Restoration Network v. U.S. Dept. of Commerce*, 878 F.3d 725, 734-35 (9th Cir. 2017).

First Amended Complaint                         13

72. The term of a special purpose permit cannot exceed three years. 50 C.F.R. § 21.95(d).

### D. The Wilderness Act

64. The Wilderness Act authorizes Congress to establish wilderness areas.

65. A wilderness area is "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c).

66. The Wilderness Act further defines a wilderness area as undeveloped land "protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable . . . ." *Id.*

67. Pursuant to the Wilderness Act, agencies are required to protect wilderness areas for "the preservation of their wilderness character." 16 U.S.C. § 1131(a).

68. "[E]ach agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." 16 U.S.C. § 1133(b).

69. Moreover, "except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter," the Wilderness Act prohibits any "structure or installation" in wilderness areas.

70. Congress included specifically enumerated "special provisions" in the Wilderness Act, which allow certain activities including measures "as may be necessary in the control of fire, insects, and diseases . . . ." 16 U.S.C. § 1131(d)(1).

First Amended Complaint                    14

71.    The special provisions do not include control of birds, mass killing of birds, control of non-native species or even control of "invasive species" other than insects.

72.    The special provisions do not include a general exemption for conservation-related activities.

## FACTUAL BACKGROUND

### A.  Barred Owls

73.    Barred owls (*Strix varia*) are native to North America and the United States. Barred owls are medium-sized owls with rounded heads, no ear tufts, and medium-length rounded tails.



**Photograph of barred owl (Wikipedia Commons)**

74.    FWS claims that the historical range of barred owls was initially limited to the eastern United States before some barred owls began to expand west around the turn of the 20th century through natural ecological processes. FWS states that climate change and increased trees in the Great Plains enabled barred owls to reach the Pacific Northwest.

First Amended Complaint                    15

75.    There is also genomic evidence, including a 2021 study, that shows substantial differentiation between eastern and western barred owls, which suggests barred owls have likely existed in the Pacific Northwest for thousands of years. Today, barred owls' range overlaps much of the range of northern spotted owls and California spotted owls.

76.    Barred owls' preferred habitats range from swamps to streamsides to uplands, and may contain hemlock, maple, oak, hickory, beech, aspen, white spruce, quaking aspen, balsam poplar, Douglas-fir, lodgepole pine, or western larch.

77.    Barred owls usually nest in tree cavities. They roost on branches and in tree cavities during the day and generally hunt by night.

### B.  Spotted Owls

78.    The spotted owl (*Strix occidentalis*) is a medium-sized owl with dark-to-chestnut brown plumage and white spots on its head, neck, back, and under-parts.

79.    Spotted owls generally rely on older forested habitats because such forests contain the structures and characteristics required for nesting, roosting, and foraging.

80.    Barred owls are slightly larger and have a more diverse diet than spotted owls. When barred owls and spotted owls are confined to the same environment, the former may out-compete the latter.

81.    Northern spotted owls (*Strix occidentalis caurina*) are one of three spotted owl subspecies.

First Amended Complaint                    16

82.     The range of the northern spotted owl extends from southwestern British Columbia through western Washington and Oregon to Marin County on the north-central coast of California.



**Photograph of northern spotted owl**
**(http://www.fws.gov/oregonfwo/species/data/northernspottedowl)**

83.     California spotted owls (*Strix occidentalis occidentalis*) are another of the three subspecies of spotted owls.

84.     California spotted owls are found in the Sierra Nevada Mountains, the mountains of central coastal California, as well as the mountain ranges of southern California.

85.     California spotted owls in the Sierra Nevada Mountains are geographically distinct from California spotted owls in central and southern California.

First Amended Complaint                    17

### C. FWS's Failure to List California Spotted Owls

86. In response to petitions and litigation urging FWS to list California spotted owls under the ESA, FWS determined in 2006 that listing the subspecies was not warranted.

87. In response to additional petitions in 2014 and 2015, FWS again found that listing California spotted owls under the ESA was not warranted in 2019.

88. In response to litigation challenging FWS's not warranted finding, FWS eventually proposed in February 2023 to list California spotted owls under the ESA.

89. FWS proposed to list the Sierra Nevada distinct population segment (DPS) of California spotted owls as threatened.

90. FWS proposed to list the Coastal-Southern California DPS of California spotted owls as endangered.

91. As of the date of this Complaint, FWS has not finalized the ESA listing for either DPS of California spotted owl.

### D. FWS's Regulation of Northern Spotted Owls, 1990-Present

92. In 1990, FWS listed the northern spotted owl as threatened under the ESA.

93. The northern spotted owl was listed as threatened primarily based on habitat loss and inadequacy of existing regulatory mechanisms to conserve the species.

94. Habitat loss was attributed primarily to timber harvest and land-conversion activities, and to a lesser degree to natural perturbations.

95. In recent years, FWS has stated that barred owls also pose a threat to northern spotted owls and California spotted owls.

First Amended Complaint                    18

96.     On January 15, 1992, FWS designated critical habitat for the northern spotted owl within 190 Critical Habitat Units, encompassing nearly 6.9 million acres.

97.     On April 13, 1994, the federal government adopted President Clinton's Northwest Forest Plan.

98.     The Northwest Forest Plan adopted a series of reserves and management guidelines that were intended to protect spotted owls and their habitats on federal land.

99.     In 2004, FWS released a five-year status review of the northern spotted owl and recommended that it remain listed as a threatened species.

100.    In May 2006, FWS established a recovery team and initiated a new recovery plan for the northern spotted owl.

101.    On April 26, 2007, FWS published the Draft Recovery Plan for the northern spotted owl.

102.    On August 13, 2008, FWS published the Final Revised Designation of Critical Habitat for the northern spotted owl.

103.    The 2008 Critical Habitat Designation reduced the designated critical habitat for the northern spotted owl by approximately 1,574,000 acres.

104.    The Department of the Interior Inspector General's Office determined that the integrity of the decision-making process for the 2008 Recovery Plan was potentially jeopardized by improper political influence.

105.    On September 1, 2010, a U.S. District Court for the District of Columbia remanded the 2008 Recovery Plan and Critical Habitat Designation to FWS for further consideration. *Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 128 (D.D.C. 2010).

First Amended Complaint                    19

106. On June 28, 2011, FWS adopted a final Revised Recovery Plan for the Northern Spotted Owl (hereinafter, "2011 Revised Recovery Plan").

107. In issuing the 2011 Revised Recovery Plan, FWS acknowledged past habitat loss, current habitat loss, and competition from barred owls as threats to northern spotted owls' recovery.

108. In issuing the 2011 Revised Recovery Plan, FWS identified thirty-three recovery action plans to protect northern spotted owls, including habitat conservation and further study regarding the impact of barred owls on northern spotted owls.

109. In issuing the 2011 Revised Recovery Plan, FWS acknowledged that the presence of barred owls increases the need for additional habitat protection, and that any measures to address competition from barred owls must be conducted simultaneously with habitat protections.

110. FWS made clear that measures taken to reduce competition from barred owls cannot be used to replace or offset measures needed for habitat conservation.

111. To reduce the potential competitive pressure between the owls, FWS recommended conserving and restoring older, multi-layered forests across the range of the northern spotted owl.

112. On March 8, 2012, FWS published notice of a proposed rule to again revise the designated critical habitat for the northern spotted owl. FWS identified 13,962,449 acres that met the definition of critical habitat.

113. Before FWS finalized the March 8, 2012 proposed rule, President Obama issued a memorandum recommending, among other things, that FWS consider excluding private and State lands from the final revised critical habitat designation.

First Amended Complaint                    20

114. On December 4, 2012, FWS published the Final Rule for the Designation of Revised Critical Habitat for the Northern Spotted Owl, which excluded all private and most state lands, resulting in a 4.3 million acre cut from the proposed designation.

115. In 2012, FWS received a petition to list the northern spotted owl as endangered.

116. It took until 2015 for FWS to issue a 90-day finding in which FWS determined that the petition presented substantial information indicating that reclassification of the northern spotted owl as endangered may be warranted.

117. In 2020, more than eight years after it had received the petition, FWS found that listing northern spotted owls as endangered was warranted.

118. FWS determined that northern spotted owls' habitat on non-federal lands had "decreased considerably over the past two decades," even though they were listed as a threatened species.

119. On federal lands, FWS determined that factors diminishing the capacity of habitat to support northern spotted owls included climate change, wildfires, and past management practices.

120. Despite this, FWS found that listing northern spotted owls as endangered was "precluded by work on other higher-priority actions."

121. As of the date of this Complaint, FWS still has not listed northern spotted owls as endangered despite finding that an endangered listing is warranted.

First Amended Complaint                    21

### E. The Barred Owl Removal Experiment

122. On September 17, 2013, FWS approved an experiment to lethally remove over 3,000 barred owls from five study areas in Washington, Oregon, and northern California (hereinafter, the "Experiment").

123. Before approving the Experiment, FWS convened a working group, which included bioethicists, to consider the ethics of the Experiment.

124. The Experiment covered five study areas: the Hoopa-Willow Creek Study Area and the Green Diamond Study Area in northern California, the Cle Elum Study Area in Washington, and the Coast Ranges/Veneta Study Area and the Klamath-Union/Myrtle Study Area in Oregon.

125. The Experiment did not target Hybrid owls for removal or killing.

126. FWS issued enhancement of survival permits under the ESA for private timber companies and the state of Oregon that authorized them to take threatened northern spotted owls in exchange for participating in the Experiment. Thus, if timber companies allowed FWS to kill barred owls on their property, FWS permitted them to destroy the habitat of spotted owls that returned.

127. When FWS analyzed the Experiment, it found that long-term northern spotted owl conservation strategies following the Experiment were speculative and not reasonably foreseeable.

128. FWS admitted that information gained from the Experiment would not trigger any specific future federal action leading to a long-term conservation plan for northern spotted owls.

First Amended Complaint                    22

129. The Experiment involved removal of barred owls on approximately 746,900 acres.

130. FWS killed a total of 2,485 barred owls during the Experiment.

131. As of the date of this Complaint, the Experiment has not produced any conclusive results about the effectiveness or feasibility of barred owl removal as a long-term conservation strategy.

132. In the comparatively small Experiment, no spotted owl populations significantly increased in areas where barred owls were removed.

133. In the Experiment, spotted owl populations continued to decline in areas where barred owls were removed.

134. The Experiment was conducted in areas where populations of barred owls were relatively sparse compared to spotted owls.

135. A study that examined the Experiment concluded that it "was unknown" whether the results the Experiment had in parts of California where barred owl populations were relatively sparse could be achieved in parts of Oregon and Washington where populations of barred owls are denser.

136. A major hope and expectation from the Experiment was that removing barred owls would enable spotted owls to create refugia, areas where barred owls would be less likely to reenter.

137. In areas where the Experiment was conducted and barred owls were removed, spotted owls failed to create refugia.

138. Because the Experiment proved unsuccessful, some who approved of the Experiment, including bioethicists, do not support the Decision.

First Amended Complaint                23

### F. Lethal Barred Owl Management Plan

139. The stated purpose of the Decision is to "reduce populations of non-native barred owls in selected areas to provide for the survival of the native northern spotted owls and prevent the invasion of non-native barred owls into the range of California spotted owls."

140. The central premise underlying the Decision is that barred owls meet the definition of an "invasive species" under Executive Order 13751.

141. Barred owls are not an invasive species under Executive Order 13751 or the MBTA.

142. Barred owls did not come to the Pacific Northwest by way of "introduction."

143. There was no "introduction" of barred owls to the Pacific Northwest because they did not arrive there "as a result of human activity" by "escape, release, dissemination, or placement."

144. Barred owls were not introduced to the Pacific Northwest because, according to FWS, they migrated there on their own over the course of many years.

145. FWS determined that the "probable explanations" for the migration of barred owls to the Pacific Northwest were climate change and increases in trees in the Great Plains.

146. Whether or not their migration to the Pacific Northwest was aided by human changes to the environment is not determinative of whether barred owls came to the Pacific Northwest through "introduction."

147. FWS thus based the Decision on the erroneous classification of barred owls as an invasive species.

First Amended Complaint                    24

148. Barred owls are native to the areas in the Pacific Northwest where the Decision will be implemented because they arrived there through a natural ecological process.

149. The Decision authorizes the killing of 2,450 barred owls in the first year, 11,309 in the second year, and 15,623 in the third year.

### a. Location

150. According to the MBTA permit application, FWS and its agents can shoot and kill barred owls anywhere within the range of the northern spotted owl, the California spotted owl, or potential pathways where barred owls could expand their range and overlap with spotted owls.

151. Killing of barred owls can occur in any mapped area. The Decision authorizes killing of barred owls on half of the total areas within the collective general management areas in each physiographic province.

152. The Decision authorizes killing of barred owls on federal, state, and private lands.

153. The Decision also authorizes the killing of barred owls on Bureau of Land Management (BLM) lands in Oregon.

First Amended Complaint                    25



**Map of areas where FWS intends to kill barred owls.**

154. For California spotted owls, barred owl removal may occur anywhere within the range of the California spotted owl or the identified potential pathways for barred owl presence in the spotted owl range.

155. The Decision authorizes the killing of barred owls in areas of California covered by three habitat conservation plans that authorize incidental take of spotted owls.

156. The Decision authorizes the killing of barred owls on over 11.7 million acres of forest at any one time.

157. The Decision authorizes the killing of barred owls on over 7.7 million acres of wilderness areas.

First Amended Complaint                    26

158.     The Decision authorizes the killing of barred owls on over 200,000 acres of wilderness study areas.

159.     In total, the Decision authorizes the killing of barred owls on 83% of the wilderness areas and wilderness study areas within the range of northern and California spotted owls.

**b. Removal methods**

160.     Shooters will lure barred owls by broadcasting calls using amplified megaphones or similar devices and will then shoot them with a shotgun.

161.     The Decision also authorizes using decoys or bait to lure barred owls into a trap or net.

162.     The Decision authorizes using nets, snare traps, and nooses to capture and kill barred owls.

163.     The training standards for people shooting barred owls under the Decision are vague and significantly less than what was required in the Experiment.

164.     If barred owls and spotted owls are in close vicinity there is an increased risk that shooting a barred owl could result in accidently killing a spotted owl.

165.     FWS recommends, but does not require, that guns used to shoot barred owls under the Decision be equipped with attached night scopes or other gunsight mechanisms.

166.     If the body of a barred owl is found, the Decision authorizes the carcass to be left and placed under branches, logs, or duff.

167.     Under the Decision, shooting of barred owls will mostly occur at night.

168.     There is a risk that spotted owls will be accidentally shot under the Decision.

First Amended Complaint                    27

169. The Decision authorizes a person to shoot and kill a barred owl on visual identification alone.

170. Spotted owls exhibit physical and vocal characteristics similar to barred owls.

171. Hybrid owls exhibit physical and vocal characteristics of both spotted owls and barred owls.

172. Visual identification of Hybrid owls can be very difficult, especially at night.

173. Confirmation of Hybrid owls is difficult and may not be possible until the animal is already killed and available for closer examination.

174. Shooters under the Decision likely have little experience with Hybrid owls.

175. Under the Decision, people can shoot barred owls in the dark with only a quarter mile buffer zone around areas with high human traffic, such as occupied dwellings, established open campgrounds, and other locations with regular human use.

176. The method of killing barred owls approved in the Decision does not meet any of the standard methods of approved take of migratory birds under the MBTA.

**c. Monitoring**

177. According to the Decision, if a spotted owl is killed, FWS will review the incident report and can authorize the resumption of barred owl shootings.

178. If someone shoots a bird and cannot recover the carcass to confirm they killed the target animal, the Decision authorizes the shooter to simply submit a data card describing the situation.

First Amended Complaint                  28

179.    The Decision includes no specific benchmarks that would require FWS to end the killing of barred owls and no specific timelines for how long FWS would suspend the killing of barred owls after a spotted owl is shot.

180.    There are no specific pre-control monitoring periods and protocols for assessing baseline population levels for barred owls and spotted owls within the management area.

181.    There are no minimum habitat conditions within the management area and no commitment to maintain minimum habitat conditions throughout implementation of the Decision.

182.    There are no minimum goals for active spotted owl activity centers within the management area under the Decision.

183.    The Decision includes no mechanism to ensure that all killings of spotted owls are reported.

### d.  MBTA Permit

184.    As early as 2020, FWS realized that the MBTA's protection of barred owls presented an obstacle to largescale killing of barred owls.

185.    FWS considered the possibility of removing barred owls in the western United States from the MBTA.

186.    FWS ultimately concluded that removing barred owls in the western United States from the MBTA would be too difficult to accomplish and removed this from consideration.

187.    FWS recognized as early as 2020 that existing MBTA permits did not cover the Lethal Management Program.

First Amended Complaint                   29

188.    While FWS believed that a depredation permit under 50 C.F.R. § 21.41 was the best fit among existing MBTA permits, FWS knew that a depredation permit was not a viable option for the Lethal Management Program because of the regulation's prohibitions on luring birds to within shooting range.

189.    During 2020 and 2021, FWS recognized that an MBTA Special Purpose Permit was not appropriate for the Lethal Management Program.

190.    To get around the restrictions presented by the MBTA, FWS began discussing creating a new MBTA permit for species protection.

191.    To create a new MBTA permit, FWS envisioned issuing new MBTA regulations after taking public comments.

192.    In connection with the new type of MBTA permit and new MBTA regulations, FWS planned to conduct a NEPA analysis.

193.    FWS eventually decided not to take public comments, not to issue new MBTA regulations, and not to do an MBTA-specific NEPA analysis.

194.    In February 2024, FWS purported to create a new type of permit and requirements for obtaining such permits, the Special Purpose Agency Species Protection Permit Processing Procedures (the "Species Protection Rule").

195.    FWS issued the Species Protection Rule without any public notice or opportunity to comment.

196.    The Species Protection Rule purports to authorize the use of MBTA Special Purpose Permits to protect species of concern with a new type of permit, a Special Purpose Agency Species Protection Permit ("Species Protection Permit").

First Amended Complaint                              30

197. The Species Protection Rule purports to create a new right to take protected migratory birds in circumstances that are otherwise not authorized by the MBTA or its regulations.

198. In June 2024, FWS applied for an MBTA Special Purpose Permit to take barred owls from the Service Migratory Birds and Habitat Program ("FWS Birds"), a division of FWS.

199. There is no application or form for a Species Protection Permit.

200. FWS Birds issued FWS an MBTA permit titled Special Purpose Agency Species Protection Permit (the "MBTA Permit").

201. FWS's Migratory Bird Permitting Handbook lists twelve types of justifications for MBTA Special Purpose Permits.

202. When the MBTA Permit was issued, FWS's Migratory Bird Permitting Handbook did not mention Species Protection Permits.

203. FWS's Migratory Bird Permitting Handbook still does not mention Species Protection Permits.

204. In granting the MBTA Permit, FWS Birds relied on the classification of barred owls as an invasive species and claimed that FWS offered a compelling justification that the take of barred owls was warranted for the protection of spotted owls.

205. In granting the MBTA Permit, FWS Birds also relied on the Species Protection Rule.

206. FWS Birds claimed that barred owl competition is "one of the primary threats" to spotted owls and that this competition "has resulted in the collapse of northern spotted owl populations across their range."

First Amended Complaint                    31

207.    FWS Birds claimed that "several studies" demonstrate "barred owl presence is a primary causative factor in the recent declines of spotted owl populations."

208.    FWS Birds claimed that the issuance of the MBTA Permit was consistent with the MBTA and compatible with its Conventions because, in part, the Decision will not jeopardize the continued survival of barred owls as a species.

209.    The MBTA Permit authorizes the killing of over 29,000 barred owls within the first three years of implementation of the Decision.

210.    Never before has an MBTA permit been issued for the killing of such a large number of birds to manage competition between bird species.

### G.  Final Environmental Impact Statement

211.    FWS defined the purpose of the proposed action as being "to reduce barred owl populations to improve the survival and recovery of northern spotted owls and to prevent declines in California spotted owls from barred owl competition."

212.    FWS defined the need for the proposed action as the competition between barred owls and spotted owls, alleging competition was "a primary cause of the rapid and ongoing decline of northern spotted owl populations."

213.    FWS considered six alternatives: five action alternatives and one no action alternative.

214.    All five action alternatives involved the killing of barred owls in different areas of the range of spotted owls.

215.    All five action alternatives proposed the killing of hundreds of thousands of barred owls.

First Amended Complaint                              32

216.    Alternative 2 was the preferred alternative and the alternative ultimately selected.

217.    FWS failed to consider in detail any alternatives that involved non-lethal methods, such as hazing or translocating barred owls.

218.    FWS failed to consider in detail any alternatives that considered habitat management.

219.    The protection of sufficient habitat would reduce competition between barred and spotted owls, increase chances of coexistence, and provide an ethical and effective long-term management strategy.

220.    In response to numerous commenters who urged FWS to consider not killing barred owls and to do more to conserve the habitat of spotted owls, FWS simply responded that it was already protecting the habitat of spotted owls.

221.    FWS failed to consider how killing barred owls would impact the survival and recovery of spotted owls if the management plan does not include measures to protect spotted owls and their habitat when barred owls are removed.

222.    The EIS acknowledges that incidental take of spotted owls on BLM lands in Oregon is not allowed until implementation of the Decision has begun.

223.    The EIS acknowledges that any prohibition of incidental take of spotted owls on BLM lands in Oregon will end once implementation of the Decision has begun.

224.    Thus, the Decision will authorize the take of spotted owls, including their habitat, in areas where it was previously not authorized.

First Amended Complaint                     33

225.    The EIS did not consider what effects this end of the incidental take prohibition on Oregon BLM lands would have on spotted owls once barred owls are removed.

226.    The EIS acknowledges that three Habitat Conservation Plans (HCPs) in northern California include barred owl removal studies.

227.    The EIS found that timber harvest on lands covered by these HCPs would not be affected by the Decision.

228.    The EIS did not consider what effects removing barred owls would have on lands covered by HCPs, or eligible for HCPs, where incidental take of spotted owls is authorized.

229.    The EIS failed to consider the impact of incidental take and how inadequate protection for spotted owls in areas where barred owls are killed undermines the alleged purpose of the lethal management, to provide for the survival and recovery of spotted owls.

230.    The EIS acknowledges that timber companies could apply for and receive incidental take permits in some areas where barred owls are killed, allowing them to take spotted owls and destroy their habitat.

231.    The EIS failed to examine data indicating that lethal management of barred owls is not likely to result in an increase in spotted owl populations and failed to explain its Decision.

232.    FWS's conclusion that the Decision would result in an increase in spotted owl populations is contrary to the evidence.

233.    FWS failed to give a hard look at how the lethal management strategy authorizes killing of owls on a scale that is larger than ever before in the United States.

First Amended Complaint                34

234. FWS failed to consult with ethicists or bioethicists during the NEPA process or at any point in issuing the Decision.

235. FWS failed to consider in any detail the ethical implications of killing a large number of barred owls.

236. Ethical concerns associated with the Decision are wider ranging than those associated with the Experiment.

237. Ethical considerations include: the intrinsic value of living beings such as barred owls and the harm that this will cause to individual owls; the emotional and recreational impact to people that value and enjoy barred owls; whether it is ethical to prioritize some owls over others; whether killing animals or manipulating natural competition between species is justified; whether it is ethical to interfere with the barred owls' natural interest and adaptations; whether the scope of killing—approximately 450,000 birds in the first thirty years, with no end goal—is justified; whether it is responsible to proceed when previous studies demonstrate that killing barred owls is not likely to lead to the recovery of spotted owls; whether the public could lose trust in FWS for proceeding with the Decision; whether killing competitor species overlooks the root causes of species decline, such as habitat destruction and climate change; how to weigh the impact to individual owls that could be killed against the impact to a species of owls; that it is inappropriate to interfere with barred owls' natural interests and adaptations; the long-term impacts of the Decision and whether it could set a precedent for killing animals in a myriad of circumstances, including when they outcompete other species or adapt to a changing environment.

238.    The ethical implications of the Decision reflect impacts to the human environment, including owls and their habitat.

239.    The presence of spotted owls can have significant economic impacts on the timber industry and private landowners.

240.    FWS failed to consider how the Decision could normalize the killing of owls and make enforcement of poaching or protecting northern spotted owls more difficult.

241.    FWS failed to consider the higher risk that spotted owls will be killed by mistake under the Decision because it is significantly larger than the Experiment or anything similar, involves significantly more shooters, more animals, and covers a much larger area.

242.    The EIS relies on the classification of barred owls as an invasive species.

243.    FWS failed to consider the impact of classifying a species as invasive merely because they alter their range as a result of anthropogenic changes to the environment, such as climate change.

244.     FWS's interpretation of invasive species would have significant far-reaching impacts that the EIS failed to consider.

245.    FWS failed to consider the financial cost of killing hundreds of thousands of barred owls.

246.    FWS had previously estimated that the cost of the Experiment would be $2,910,000.

247.    The Decision proposes to kill approximately 180 times more owls than the Experiment.

First Amended Complaint                  36

248.    Because the Decision involves killing exponentially more barred owls over a much larger area and a longer time period, the cost of the Decision will greatly exceed the cost of the Experiment.

249.    The EIS acknowledges that the Decision will result in the removal of barred owls from wilderness areas.

250.    FWS intends to install autonomous recording units in wilderness areas and leave them in place for at least a year.

251.    FWS found in the EIS that the Decision "would have a negative effect on wilderness character on these [wilderness areas] in several ways."

252.    The EIS acknowledges that FWS will intentionally manipulate wildlife populations in wilderness areas and determines that this will have a negative impact to the untrammeled quality of wilderness areas.

253.    The EIS acknowledges that the removal of barred owls from wilderness areas will increase human activity and sounds, which will negatively impact opportunities for solitude and primitive and unconfined recreation in wilderness areas.

254.    The EIS acknowledges that the shooting of barred owls in wilderness areas will have a negative impact to the natural quality of wilderness areas.

255.    The EIS acknowledges that the installation of autonomous recording units in wilderness areas will negatively impact the undeveloped nature of wilderness areas.

256.    The EIS did not consider any alternatives that prohibited the shooting of barred owls in wilderness areas.

First Amended Complaint                    37

### H. Other agencies adopt FWS's EIS to implement barred owl removal.

257. On January 8, 2025, BLM issued a decision adopting FWS's EIS for the Barred Owl Management Strategy ("BLM Adoption").

258. Through the BLM Adoption, BLM intends to implement the Lethal Management Program on BLM lands in western Oregon within the range of the northern spotted owl.

259. BLM plans to obtain authority to kill barred owls by becoming a designee under the FWS's MBTA permit.

260. On April 30, 2025, APHIS issued a decision adopting FWS's EIS for the Barred Owl Management Strategy ("APHIS Adoption").

261. Through the APHIS Adoption, APHIS intends to implement the Lethal Management Program within the range of the northern spotted owl in Oregon.

262. APHIS plans to obtain authority to kill barred owls by becoming a designee under FWS's MBTA Permit.

## FIRST CAUSE OF ACTION – FWS and Morrison
### (MBTA/APA)

263. Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

264. FWS failed to demonstrate a compelling justification for the MBTA Permit.

265. FWS failed to demonstrate a valid justification for the MBTA Permit.

266. The MBTA Permit relies on the classification of barred owls as an invasive species.

267. Barred owls in the Pacific Northwest are not an invasive species.

First Amended Complaint                    38

268. FWS's determination that barred owls are an invasive species was arbitrary and capricious, in excess of statutory authority, and unsupported by substantial evidence.

269. FWS's issuance of the MBTA Permit conflicts with its own guidance and policy.

270. FWS failed to provide any explanation for departing from its own guidance and policy.

271. FWS issued a Species Protection Permit to avoid restrictions of other permits, rather than because it was the appropriate permit for the lethal management of barred owls.

272. It was arbitrary and capricious for FWS to issue the MBTA Permit.

273. In evaluating the harm to barred owls, it was arbitrary and capricious for FWS to consider only whether issuing the MBTA Permit would threaten the conservation of barred owls as a species.

274. It was in excess of statutory authority and unlawful for FWS to issue a permit that allows the taking of migratory birds by baiting, in violation of the MBTA.

275. It was arbitrary and capricious for FWS to determine that the Experiment offered evidence that the MBTA Permit would meaningfully benefit spotted owls.

276. The Decision and the MBTA Permit are incompatible with the purposes of the MBTA.

277. The Decision and the MBTA Permit are inconsistent with and fundamentally violate the MBTA Conventions.

278. Neither the MBTA nor the MBTA Conventions authorize the Decision.

First Amended Complaint                    39

279.    FWS's issuance of the Decision is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law or required procedure, and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and must be set aside under the APA, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION – All Defendants
### (NEPA/APA)

280.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

281.    By limiting the purpose of the proposed action to reducing barred owl populations, the EIS defined the purpose too narrowly.

282.    FWS erred by defining the need for the proposed action in the EIS to include that "[c]ompetition from barred owls is a primary cause of the rapid and ongoing decline of northern spotted owl populations."

283.    The EIS failed to consider a reasonable range of alternatives in the EIS by only considering action alternatives centered around the killing of barred owls.

284.    The EIS failed to consider any action alternatives that prohibited shooting of barred owls in areas where incidental take of spotted owls is authorized.

285.    The EIS failed to consider any action alternatives that prohibited shooting of barred owls in wilderness areas.

286.    The EIS failed to consider any alternatives that would mitigate the loss of spotted owl habitat.

287.    The EIS failed to take a hard look at whether the killing of barred owls alone would significantly help to conserve spotted owls.

First Amended Complaint                    40

288. The EIS failed to take a hard look at the ethical implications and ethical impacts of the Decision and proposed alternatives.

289. The EIS failed to take a hard look at whether barred owls should be considered an invasive species.

290. The EIS's determination that barred owls are an invasive species was arbitrary and capricious and unsupported by substantial evidence.

291. The EIS failed to take a hard look at the cumulative impacts of lethal barred owl management and the precedent it could set for future management decisions.

292. The EIS failed to take a hard look at whether the mass slaughter of barred owls would reduce social stigmas against killing owls and other protected bird species.

293. The EIS failed to take a hard look at whether the mass slaughter of barred owls may increase poaching of barred owls, spotted owls, or other bird species.

294. The EIS failed to take a hard look at whether the results of the Experiment showed that killing barred owls was not likely to significantly increase spotted owl populations.

295. The EIS failed to take a hard look at the impact of killing of barred owls in areas where spotted owls and their habitat are not protected and how such killing is inconsistent with the survival and recovery of spotted owls.

296. The EIS failed to fully analyze the impacts of the Decision and the MBTA Permit.

297. BLM and APHIS acted arbitrary and capriciously by adopting FWS's EIS for the Barred Owl Management Strategy.

First Amended Complaint                    41

298.    FWS's issuance of the EIS, and subsequent agency adoptions of it, are therefore arbitrary, capricious, an abuse of discretion, not in accordance with law or required procedure, and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and must be set aside under the APA, 5 U.S.C. § 706.

**THIRD CAUSE OF ACTION – FWS, BLM, and Morrison**
**(Wilderness Act/APA)**

299.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

300.    Defendants intend to shoot and kill barred owls in multiple wilderness areas.

301.    Despite determining that the Decision would have negative effects on the wilderness character of wilderness areas, FWS failed to alter the Decision to avoid those negative effects.

302.    The Lethal Management Program violates the Wilderness Act by intentionally altering the wilderness character of multiple wilderness areas.

303.    Through the Lethal Management Program, Defendants would cause multiple wilderness areas to lose their natural character and render them no longer untrammeled by humans.

304.    The Lethal Management Program violates the Wilderness Act by diminishing the opportunities for solitude and primitive and unconfined recreation in multiple wilderness areas.

305.    The Lethal Management Program violates the Wilderness Act's prohibition on structures and installations by authorizing the long-term placement of autonomous recording units in wilderness areas in order to identify barred owls to kill.

First Amended Complaint                    42

306. The Lethal Management is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law or required procedure, and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and must be set aside under the APA, 5 U.S.C. § 706

**FOURTH CAUSE OF ACTION – All Defendants**
**(APA – Arbitrary and Capricious Agency Action)**

307. Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

308. Defendants have adopted the Lethal Management Program in which they will kill up to 450,000 barred owls over the next thirty years.

309. The Lethal Management Program constitutes arbitrary and capricious agency action for a number of reasons.

310. The Lethal Management Program is arbitrary and capricious because it will not help to conserve spotted owls.

311. The Lethal Management Program is arbitrary and capricious because it does not solve the problem it seeks to fix: even if fully and successfully implemented, barred owls will continue to inhabit the Pacific Northwest in large numbers, they will continue to compete with spotted owls, and additional barred owls will continue to arrive in the Pacific Northwest.

312. The Lethal Management Program is arbitrary and capricious because it defines barred owls in the Pacific Northwest as an invasive species.

313. Barred owls in the Pacific Northwest do not meet the federal definition of an invasive species.

First Amended Complaint                    43

314. The Defendants would not have adopted the Lethal Management Program had they not defined barred owls as an invasive species.

315. Barred owls in the Pacific Northwest are a native species, as defined by the MBTA.

316. The Lethal Management Program is arbitrary and capricious because it defines barred owls in the Pacific Northwest as a nonnative species.

317. The Defendants would not have adopted the Lethal Management Program had they not defined barred owls as a nonnative species.

318. The Lethal Management Program is arbitrary and capricious because Defendants failed to consider an important aspect of the issue, namely whether it is ethical to kill such a large number of barred owls even if doing so is of some benefit to spotted owl conservation.

319. The Lethal Management Program is arbitrary and capricious because Defendants failed to consider a significant aspect of the problem, namely if natural competition between species can justify the massive killing of animals across an entire region.

320. The Lethal Management Program is arbitrary and capricious because Defendants failed to determine what it will cost to implement.

321. The Lethal Management Program is arbitrary and capricious because it authorizes the killing of barred owls in locations where such killing will demonstrably not help to conserve spotted owls.

322. FWS's issuance of the Decision is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law or required procedure, and in excess of statutory

First Amended Complaint                44

jurisdiction, authority, or limitations, or short of statutory right, and must be set aside under the APA, 5 U.S.C. § 706

### FIFTH CAUSE OF ACTION – FWS and Morrison
### (APA – Violation of Rulemaking Procedure)

323.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

324.    In purportedly authorizing Special Purpose Permits to protect species of concern and issuing the Species Protection Rule, FWS engaged in a rule making.

325.    The Species Protection Rule is a substantive rule that creates rights and duties and amends existing regulations.

326.    The Species Protection Rule changes the criteria for obtaining a permit under the MBTA.

327.    FWS followed none of the APA's requirements for rule making when it purported to create Species Protection Permits.

328.    FWS did not submit a notice for publication in the Federal Register about the proposed creation of Species Protection Permits or the Species Protection Rule.

329.    In creating the Species Protection Permits and issuing the Species Protection Rule, Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. APA, 5 U.S.C. § 706.

First Amended Complaint                    45

## REQUEST FOR RELIEF

Friends of Animals respectfully requests that the Court enter judgment providing the following relief:

1.      Declare that FWS violated the MBTA and the APA and acted arbitrarily and capriciously and in excess of its statutory authority by issuing the MBTA Permit authorizing the take of barred owls.

2.      Vacate the MBTA Permit.

3.      Declare that FWS violated NEPA and the APA and acted arbitrarily and capriciously in issuing the EIS and associated Record of Decision.

4.      Declare that the Lethal Management Program violates the Wilderness Act and APA and that Defendants acted arbitrarily and capriciously and in excess of its statutory authority and vacate all portions of the Lethal Management Program authorizing actions in wilderness areas.

5.      Set aside and remand back to Defendants the Decision, Lethal Management Program, MBTA Permit, EIS, and Record of Decision.

6.      Enjoin any action authorized under the Lethal Management Program and MBTA Permit unless and until Defendants fully comply with the law.

7.      Declare that FWS violated the APA in issuing the Species Protection Rule.

8.      Vacate the Species Protection Rule.

9.      Award Friends of Animals its reasonable costs, including reasonable attorney fees under the Equal Access to Justice Act (5 U.S.C. § 504; 28 U.S.C. § 2412); and

First Amended Complaint                    46

10.     Grant Friends of Animals any other relief that the Court deems just and proper.

Dated: September 11, 2025          Respectfully Submitted,

*/s/ Stephen Hernick*
JENNIFER BEST (*pro hac vice*)
STEPHEN HERNICK (*pro hac vice*)
Friends of Animals, Wildlife Law Program
6041 S. Syracuse Way, Suite 250
Greenwood Village, CO 80111
(720) 945-9453
jennifer@friendsofanimals.org
shernick@friendsofanimals.org

DAVID A. BAHR (Oregon Bar No. 901990)
Bahr Law Offices, P.C.
1035 ½ Monroe Street
Eugene, OR 97402
(541) 556-6439
davebahr@mindspring.com

*Counsel for Plaintiff*

First Amended Complaint                    47