DAVID A. BAHR (Oregon Bar No. 901990)
Bahr Law Offices, P.C.
1035 ½ Monroe Street
Eugene, OR 97402
(541) 556-6439
davebahr@mindspring.com

STEPHEN HERNICK (*pro hac vice*)
JENNIFER BEST (*pro hac vice*)
Friends of Animals, Wildlife Law Program
6041 S. Syracuse Way, Suite 250
Greenwood Village, CO 80111
(720) 945-9453
shernick@friendsofanimals.org
jennifer@friendsofanimals.org

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| FRIENDS OF ANIMALS,<br>Plaintiff,<br>v.<br>HUGH MORRISON, et al.<br>Defendants. | Lead Case No. 3:24-cv-01928-AN;<br>Consolidated with Case No.: 3:25-cv-01739-AN<br><br>**FRIENDS OF ANIMALS' MOTION FOR SUMMARY JUDGMENT**<br>Oral argument scheduled June 3, 2026 |

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ ii

MOTION FOR SUMMARY JUDGMENT ........ 1

MEMORANDUM IN SUPPORT OF MOTION ........ 1

FACTUAL BACKGROUND ........ 2

A. FWS has repeatedly failed to adequately conserve spotted owls. ........ 2

B. Barred owls are not an invasive species because they are native to North America and have expanded their habitat on their own accord. ........ 5

C. FWS's experiment of killing barred owls in select areas proves of limited value to spotted owls. ........ 6

D. Defendants issue the Decision, embarking on at least decades of widescale killing of barred owls, to unknown benefit to spotted owls. ........ 10

STANDARD OF REVIEW ........ 14

ARGUMENT ........ 15

A. FWS violated the MBTA and APA and exceeded its discretion in issuing an MBTA permit for the killing of hundreds of thousands of barred owls and doing what it had previously acknowledged "you can't do." ........ 15

1. The MBTA and underlying conventions prohibit FWS from issuing an MBTA permit for the Program. ........ 17

a. The Permit is based on FWS arbitrarily defining barred owls as invasive. ........ 18

b. The Permit violates additional aspects of the MBTA and conventions. ........ 26

2. FWS violated MBTA regulations in issuing a special purpose permit. ........ 27

3. FWS violated the APA by creating a new MBTA permit rule without adhering to rulemaking requirements. ........ 33

B. FWS violated NEPA and the APA when it failed to take a hard look at the ethical impacts of the Program and the impacts to individual barred owls. ........ 35

C. Defendants violated the Wilderness Act by authorizing widescale killing of barred owls in wilderness areas. ........ 39

D. Friends of Animals has standing. ........ 43

CONCLUSION ........ 43

## TABLE OF AUTHORITIES

### Cases

*Am. Horse Prot. Ass'n v. Andrus*,
608 F.2d 811 (9th Cir. 1979) ... 35

*Am. Wild Horse Pres. Campaign v. Zinke*,
2017 U.S.Dist.LEXIS 161599 (D. Idaho Sep. 29, 2017) ... 36

*Carpenters Indus. Council v. Salazar*,
734 F. Supp. 2d 126 (D.D.C. 2010) ... 3

*City & Cty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ... 21, 23

*Friends of Animals v. U.S. FWS*,
879 F.3d 1000 (9th Cir. 2018) ... 8

*Fund for Animals v. Kempthorne*,
538 F.3d 124 (2d Cir. 2008) ... 28

*Garcia v. INS*,
208 F.3d 725 (9th Cir. 2000) ... 32

*Hemp Indus. Ass'n v. DEA*,
333 F.3d 1082 (9th Cir. 2003) ... 33, 34

*High Sierra Hikers Ass'n v. U.S. Forest Serv.*,
436 F. Supp. 2d 1117 (E.D. Cal. 2006) ... 40

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977) ... 43

*Kester v. Campbell*,
652 F.2d 13 (9th Cir. 1981) ... 21

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ... 14, 15, 21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ... 43

*Montana Wild. Ass'n v. Connell*,
725 F.3d 988 (9th Cir. 2013) ... 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ... 14, 26

*N. Alaska Env't Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ... 35

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ... 20, 32

*Nat'l. Mining Ass'n. v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ........ 33

*NLRB v. Wyman-Gordon Co.*,
394 U.S. 759 (1969) ........ 33

*Route v. Garland*,
996 F.3d 968 (9th Cir. 2021) ........ 41

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017) ........ 33

*Seven Cty. Infrastructure Coalition v. Eagle Cty.*,
605 U.S. 168 (2025) ........ 35

*Turtle Island Restoration Network v. U.S. DOC*,
878 F.3d 725 (9th Cir. 2017) ........ 28

*Wilderness Watch v. Mainella*,
375 F.3d 1085 (11th Cir. 2004) ........ 42

*Wilderness Watch v. U.S. FWS*,
685 F. Supp. 3d 950 (D. Mont. 2023) ........ 41

*Wilderness Watch, Inc. v. U.S. FWS*,
629 F.3d 1024, 1027 (9th Cir. 2010) ........ 40

**Statutes**

16 U.S.C. § 1131(c) ........ 39

16 U.S.C. § 1133(c) ........ 40

16 U.S.C. § 1133(d)(1) ........ 40, 41

16 U.S.C. § 1531(a)(1) ........ 4

16 U.S.C. § 1531(a)(4) ........ 5

16 U.S.C. § 1531(b) ........ 5

16 U.S.C. § 1533(f)(1) ........ 3

16 U.S.C. § 1534 ........ 5

16 U.S.C. § 1535 ........ 5

16 U.S.C. § 1536 ........ 5

16 U.S.C. § 1537 ........ 5

16 U.S.C. § 1538 ........ 5

16 U.S.C. § 703(a) ........ 17

16 U.S.C. § 703(b) ........ 20

16 U.S.C. § 703(b)(2)(A) ........ 19

16 U.S.C. § 703(b)(2)(B) ........ 20

16 U.S.C. § 704(a) .......... 18, 26
16 U.S.C. § 704(b) .......... 18, 27
42 U.S.C. § 4321 .......... 39
42 U.S.C. § 4331(b)(3) .......... 39
42 U.S.C. § 4332(2)(B) .......... 35
5 U.S.C. § 551(4) .......... 33
5 U.S.C. § 551(5) .......... 14, 33
5 U.S.C. § 553 .......... 14, 33
5 U.S.C. § 553(b)(4)(A) .......... 33
5 U.S.C. § 706 .......... 14
5 U.S.C. § 706(2) .......... 14

**Regulations**

50 C.F.R. § 10.13 .......... 5, 20
50 C.F.R. § 13.21(b)(3) .......... 33
50 C.F.R. § 17.11 .......... 4
50 C.F.R. § 21.100(a) .......... 28, 29
50 C.F.R. § 21.100(c)(3) .......... 15, 28, 30
50 C.F.R. § 21.63 .......... 27
50 C.F.R. § 21.67 .......... 27
50 C.F.R. § 21.70 .......... 27
50 C.F.R. § 21.73 .......... 27
50 C.F.R. § 21.76 .......... 27
50 C.F.R. § 21.82 .......... 27
50 C.F.R. § 21.85 .......... 27
50 C.F.R. § 21.88 .......... 27
50 C.F.R. § 21.95 .......... 27, 28, 29, 30, 31, 33
50 C.F.R. § 21.95(a) .......... 28, 30
50 C.F.R. § 21.95(b)(1) .......... 28
50 C.F.R. Part 21 – Subpart D .......... 28

**Other Authorities**

55 Fed. Reg. 26114 (June 26, 1990) .......... 3
70 Fed. Reg. 372 (Jan. 4, 2005) .......... 20

70 Fed. Reg. 59710 (Oct. 13, 2005) ........ 34

72 Fed. Reg. 69705 (Dec. 10, 2007)........ 34

73 Fed. Reg. 47326 (Aug. 13, 2008) ........ 3

75 Fed. Reg. 9282 (Mar. 1, 2010) ........ 29

77 Fed. Reg. 71876 (Dec. 4, 2012) ........ 3

84 Fed. Reg. 60371 (Nov. 8, 2019)........ 4

84 Fed. Reg. 69762 (Dec. 19, 2019)........ 29

85 Fed. Reg. 46164 (July 31, 2020) ........ 4

85 Fed. Reg. 81144 (Dec. 15, 2020)........ 4

86 Fed. Reg. 4820 (Jan. 15, 2021)........ 3

86 Fed. Reg. 62606 (Nov. 10, 2021) ........ 3

88 Fed. Reg. 11600 (Feb. 23, 2023)........ 4

Convention between the United States of America and Mexico for the Protection of Migratory Birds and Game Animals art. 1, Feb. 7, 1936, 50 Stat. 211, T.S. No. 912........ 27

Disseminating, merriam-webster.com, https://www.merriam-webster.com/dictionary/disseminating (last visited Feb. 18, 2026)........ 24

Dissemination, merriam-webster.com, https://www.merriam-webster.com/dictionary/dissemination (last visited Feb. 18, 2026)........ 24

Exec. Order No. 13751........ 20, 21, 22, 23, 25, 26

H.R. Rep. No. 93-412 (1973)........ 5

Number TE84089D-0, *available at* https://ecos.fws.gov/docs/plan_documents/fdoc/fdoc_3129.pdf........ 4

## CERTIFICATE OF COMPLIANCE WITH LR 7-1

In compliance with Local Rule 7-1, the parties made a good faith effort through telephone conferences to resolve the dispute and have been unable to do so.

## MOTION FOR SUMMARY JUDGMENT

Plaintiff Friends of Animals moves for summary judgment on all claims challenging Federal Defendants' Final Environmental Impact Statement, decision to adopt the "Barred Owl Management Strategy" and the U.S. Fish and Wildlife Services' issuance of a permit authorizing the killing of up to 452,583 barred owls over thirty years (hereinafter, "Decision" or "Program"). Accordingly, and as discussed further below, Friends of Animals respectfully requests that the Court grant this Motion and set aside the challenged Decision.

## MEMORANDUM IN SUPPORT OF MOTION

The U.S. Fish and Wildlife Service's (FWS) Decision to kill hundreds of thousands of federally protected barred owls in the hope of helping spotted owls raises a number of difficult, complicated questions. But Plaintiff Friends of Animals is not asking this Court to decide those questions, such as whether humans should ever manage competition between species by killing large numbers of one to help another. Instead, this lawsuit asks the Court to decide a much easier and simpler question: did Defendants violate the law in issuing the challenged Decision?

As discussed below, it is clear that Defendants violated the Administrative Procedure Act (APA), the Migratory Bird Treaty Act (MBTA), the National Environmental Policy Act (NEPA), and the Wilderness Act. Accordingly, FWS's decision to kill up to 450,000 barred owls over thirty years must be vacated.

While Friends of Animals vehemently disagrees with the idea of killing hundreds of thousands of owls to manage competition between owl species, the Court does not need to share that view to rule in Friends of Animals' favor on its legal claims. Similarly, Friends of Animals' legal challenge should not be viewed as suggesting a lack of concern for spotted owls or a view that FWS is otherwise doing enough to conserve them. Both spotted owls and barred owls are wonderful creatures. Regrettably, FWS has repeatedly failed to take the necessary steps to conserve spotted owls. But the past failures of FWS and the resulting plight of spotted owls do not justify the decision and cannot override its unlawful aspects.

## FACTUAL BACKGROUND

### A. FWS has repeatedly failed to adequately conserve spotted owls.

In August 2024, shortly after issuing an environmental impact statement (EIS), FWS issued the Decision adopting the "Barred Owl Management Strategy" and approving the issuance of an MBTA permit authorizing the killing of up to 452,583 barred owls over thirty years. *See* 000003. [1] Since then, Defendants Bureau of Land Management (BLM) and Animal Plant and Health Inspection Service (APHIS) have issued separate decisions adopting FWS's EIS and authorizing implementation of the Program. BLM_000004; APHIS_000010. The Decision followed decades of failures by FWS to adequately conserve spotted owls. Friends of Animals will briefly recount some of this relevant history.

Spotted owls are medium-sized forest owls native to western North America. 000053. There are three subspecies of spotted owls, two of which are the intended beneficiaries of the Decision: northern spotted owls, who range from southwestern British

[1] Citations containing six-digit numerals refer to the administrative record. Citations prefaced with "BLM" or "APHIS" refer to those agencies' respective records; citations without a prefix refer to FWS's record.

Columbia to northern California, and California spotted owls, who occur in the Sierra Nevada Mountains and the coastal mountains of California. *Id.* Spotted owls primarily eat forest rodents such as flying squirrels, woodrats, and red tree voles. 000054. Spotted owl populations have declined across their range since population tracking began in the early 1990s. 000059.

When FWS listed northern spotted owls as threatened under the Endangered Species Act (ESA) in 1990, it attributed their decline to habitat loss, primarily from logging, and the inadequacy of existing regulatory mechanisms. 55 Fed. Reg. 26114, 26175-92 (June 26, 1990). Since then, however, FWS has taken numerous actions that have failed northern spotted owls. First, FWS waited nearly sixteen years after listing to convene a team to develop a recovery plan for the subspecies. *See Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 129 (D.D.C. 2010); 16 U.S.C. § 1533(f)(1) (requiring FWS to develop and implement recovery plans for listed species).

Second, FWS has alternated between delaying the designation of critical habitat and reducing the number of acres designated as critical habitat. After designating over 6.9 million acres of critical habitat in 1992, FWS reduced that critical habitat by over 1.5 million acres in 2008. 73 Fed. Reg. 47326, 47328, 47351 (Aug. 13, 2008). The Inspector General of the Department of the Interior later determined that this revision of critical habitat was "potentially jeopardized" by improper political influence. *Carpenters Indus. Council*, 734 F. Supp. 2d at 131. After FWS later determined that 13,962,449 acres merited critical habitat designation, the agency ultimately designated fewer than 9.6 million acres of critical habitat. 77 Fed. Reg. 71876, 71877 (Dec. 4, 2012). In 2021, FWS then excluded over 3.4 million acres of critical habitat, reducing the area designated to just over 6.1

million acres. 86 Fed. Reg. 4820, 4831 (Jan. 15, 2021). FWS later withdrew that rule and excluded 204,294 acres instead. 86 Fed. Reg. 62606 (Nov. 10, 2021).

Third, FWS continues to authorize the incidental take of northern spotted owls from logging. For example, a permit that FWS issued to Sierra Pacific Industries while it was developing the Program authorizes the incidental take of up to 115 northern spotted owls and 649 California spotted owls over fifty years. *E.g.*, 85 Fed. Reg. 46164 (July 31, 2020); Permit Number TE84089D-0, *available at* https://ecos.fws.gov/docs/plan_documents/fdoc/fdoc_3129.pdf.

Finally, since at least 2012, FWS has avoided requests to list northern spotted owls as endangered. *See* 85 Fed. Reg. 81144, 81145 (Dec. 15, 2020). Although FWS finally conceded in 2020 that the subspecies' status warrants an endangered listing, it has refused to so list them, declaring that such action is "precluded by work on higher-priority actions." *Id.* at 81146.

FWS has yet to even protect California spotted owls under the ESA. In 2006 and again in 2019, FWS found that listing California spotted owls under the ESA was not warranted. 84 Fed. Reg. 60371, 60372 (Nov. 8, 2019). Only in response to litigation did FWS finally propose to list them as threatened in 2023. 88 Fed. Reg. 11600 (Feb. 23, 2023). But in nearly three years since, FWS has not yet finalized their listing, meaning the subspecies remains unprotected under the ESA. *See* 50 C.F.R. § 17.11.

Congress passed the ESA to protect species and their habitats from human activity—not to manage competition between native species. 16 U.S.C. § 1531(a)(1). Namely, Congress found that "economic growth and development untempered by adequate concern and conservation" was causing widespread extinction of species. *Id.* Legislative

history confirms that Congress sought to address human actions leading to decline of species, "the most significant" of which is "the destruction of critical habitat." H.R. Rep. No. 93-412, at 5 (1973). Thus, Congress declared the purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

The structure of the ESA confirms that the ESA protects species by protecting their habitats and restricting take, not by authorizing lethal control of other species. *See* 16 U.S.C. §§ 1534-1538. Finally, the ESA emphasizes the duty to conserve species covered by the Migratory Bird Treaties, such as barred owls. *See* 16 U.S.C. § 1531(a)(4), (b). Read as a whole, the ESA reflects Congress's judgment that species recovery is achieved by limiting harmful human activity and conserving habitat—not by killing one native species to address ecological competition with another.

**B. Barred owls are not an invasive species because they are native to North America and have expanded their habitat on their own accord.**

Barred owls share many similarities with spotted owls. Like spotted owls, barred owls are native to North America and protected under the MBTA. 50 C.F.R. § 10.13. Historically (before the 1900s), barred owls were found in eastern North America, south of the 49th parallel as well as in central Mexico. 000056. Barred owls tend to utilize a wider range of forested habitat than spotted owls. *Id*. While barred owls eat the same rodents spotted owls do, barred owls are more generalist predators than spotted owls and eat a wide variety of animals, making them highly adaptable. 000056-57.

FWS concedes that it does not know exactly why barred owls began expanding their range westward during the 1900s. 000057. FWS has pointed to a number of potential explanations, including planting of trees and other tree expansion in the northern Great

Plains, fire suppression, and climate change. *Id.* However, numerous studies considered by FWS acknowledge that barred owls may have expanded westward naturally, without any human influence. *See, e.g.,* 011575 ("[T]he westward expansion of barred owls from their native range may be human-induced or a natural process."); 037411 ("It is also not clear if the expansion is a natural occurrence or human influenced."); 044241 (discussing multiple hypotheses for range expansion). Livezey, a researcher on whom FWS relies, theorized that the westward expansion of barred owls was "prohibited for millennia by actions of Native Americans and recently facilitated by actions of European settlers," 046441, suggesting that human activity may have prevented barred owls' expansion westward earlier. Another study provided genetic evidence that barred owls may have colonized western North America thousands of years ago. 034552.

Despite the various theories, FWS concludes, with no explanation for its certainty, that barred owls' "movement was made possible by human-caused changes to the northern Great Plains and northern boreal forest." 000128. Regardless of why barred owls expanded their range westward, no one contends that they were transported westward by humans.

### C. FWS's experiment of killing barred owls in select areas proves of limited value to spotted owls.

In 2011, FWS suggested that competition from barred owls was posing an additional threat to northern spotted owls. 000060. While barred owls compete with spotted owls for food and habitat, barred owls do not prey on spotted owls. *See id.* In fact, barred owls and spotted owls often breed, producing fertile offspring that FWS terms "hybrids." 000139.

The logging industry pioneered the idea of killing barred owls in spotted owl habitat. *See* 000062. The first study of the effects on spotted owls of killing barred owls

began in 2009 under the stewardship of Green Diamond Resource Company employee Lowell Diller on that logging company's land. *See id.*; 031872; 016032.

In 2013, FWS embarked on an experiment to kill roughly 2,500 barred owls in four additional study areas: Hoopa-Willow Creek, the Coast Ranges, Union/Myrtle-Klamath, and Cle Elum ("Experiment"). 000062. A study providing a meta-analysis of all five areas was published in 2021. 008363-008371.

*Map of experimental study area - 008364*




Before deciding to proceed with the Experiment, FWS convened the Barred Owl Stakeholder Group (the "Group"), including ethicists, to consider and opine on the ethical dilemmas inherent in killing one owl species in an effort to help another owl species. 000571. The Group was "composed of over forty invited representatives from relevant

government agencies, the forest product industry, Native American tribes, wildlife rehabilitators, environmental organizations, and animal protection groups." 002673.While the Group ultimately approved of the undertaking of the Experiment to determine its effectiveness, its approval was for the limited scope and specific circumstances of the Experiment, rather than approval of any long-term killing of barred owls. 002668-729. FWS hoped that the Experiment would show that killing barred would enable spotted owls to thrive and establish refugia where barred owls would not return in significant numbers. *See, e.g.*, 068894 (explaining that one need for the Experiment was to "evaluate" the "level of ongoing removal required to maintain low populations levels of barred owls"); *see also* 001964 (Program focused on creating refugia for northern spotted owls).

Friends of Animals challenged the Experiment, alleging violations of NEPA and the MBTA. *See Friends of Animals v. U.S. FWS*, 879 F.3d 1000 (9th Cir. 2018). The Ninth Circuit ultimately held that the issuance of an MBTA scientific collecting permit for the Experiment (a different type of MBTA permit than the one at issue here) did not violate the MBTA. *Id.* at 1007.

The Experiment did not meet FWS's hopes. Spotted owls did not create refugia in the areas where FWS killed barred owls. Instead, other barred owls recolonized areas where FWS killed barred owls and FWS acknowledges it has no data to support a future decline in this recolonization. 001895; 075155; 012742; 011576 (describing barred owl recolonization as "rapid"). The Experiment had a statistically insignificant impact on recruitment of spotted owls to areas where barred owls were killed. *See* 008366; 008368; 039475. In fact, the authors of the study stated that "[w]ithout additional recruitment, recovery and long-term persistence of spotted owls is unlikely." 008369. Consistent with

this, spotted owl populations continued to experience declines in four out of the five study areas. *See* 021834; 008367 (see rate of population change below 1.0 in those four areas). These four areas represent most of the northern spotted owls' range, where barred owls are widespread. *See* 034349. Only in the timber company study area (Green Diamond) did spotted owls experience a stable to growing population after killing of barred owls, and that was an area at the front of barred owl range expansion where spotted owl numbers were relatively high and barred owl numbers relatively low. *See* 008367; 031892; 034349. FWS's EIS acknowledged this reality. 001749-001750. Modeling carried out for the BLM's Resource Management Plan in Oregon also showed negligible effects of barred owl removal on northern spotted owl extinction risk in 4 out of 6 modeling regions. BLM_003482-86.

*Figure 1 - Annual Number of Banded Spotted Owls Detected - 021819*



### D. Defendants issue the Decision, embarking on at least decades of widescale killing of barred owls, to unknown benefit to spotted owls.

Despite the Experiment's mixed results, in August 2020, FWS, under the leadership of Robin Bown, convened a team to develop a strategy "for the management of the invasive barred owl" throughout the entire range of spotted owls. *E.g.*, 021810. Logically, since FWS's initial goal was to "reduce the impact of barred owls on spotted owls," it did not have to limit itself to shooting barred owls and could have considered a number of "other options." *See* 021593; *see also* 020319-20. But before the end of 2021, planning had narrowed to shooting large numbers of barred owls over decades and any other ways to reduce the negative impacts of barred owls on spotted owls were off the table. *See* 018033. FWS did not convene another stakeholder group or consider whether long-term killing of barred owls was ethical. FWS issued a notice of intent to prepare an EIS on July 22, 2022. 016126-29. It then issued a draft EIS, 007741-8004, and a draft "Barred Owl Management Strategy" in November 2023. 008005-8308. It finalized the EIS in June 2024. 001651-2002. FWS applied for an MBTA permit in June 2024. 000386-95. FWS then issued the requested MBTA permit on August 23, 2024, with the header identifying the permit as "Special Purpose Agency Species Protection" (hereinafter "Permit"). 000380-82.

FWS, perhaps understandably, prefers to use the terms "management" or "removal" of barred owls. That sanitizes the effects of the Decision, however, whereby FWS will be shooting and killing hundreds of thousands of barred owls, not "removing" them to another location, and, in fact, not even "removing" their carcasses after shooting them. 000138. As will be discussed in more detail below, FWS also incorrectly labels and defines barred owls as an "invasive species." *E.g.*, 000122-28. Such terminology surely makes some more

comfortable with the mass killing of barred owls, but is wrong on multiple levels and a terrible precedent.

The Decision authorizes the killing of up to 452,583 barred owls over thirty years in Washington, Oregon, and northern California. 000039. Shooting of barred owls may occur on federal, state, tribal, or private lands, assuming landowners approve. 000008. APHIS's Wildlife Services will perform a substantial amount of the killing. *See* BLM_000440. FWS also intends to deputize an unknown number of shooters, who will lure barred owls into shooting range by using megaphones to broadcast recorded barred owl calls before killing them with shotguns. 000136-37. Shooters may kill hybrid owls as well. 000132. In locations where shotguns cannot be used, the Decision authorizes capture in nets, snares, traps, and noose poles with a plastic decoy or live mice; barred owls captured will then be killed by unspecified methods. 000029, 142. Barred owls killed under the Decision will generally be left on site, covered by "duff, branches, or logs." 000138.

FWS could have targeted specific areas to kill barred owls where it believed it would be most beneficial to spotted owls, but that is not the Decision FWS made. Instead, FWS authorized killing of barred owls over a huge area, maintaining maximum "flexibility" to implement the Program over three decades as it likes. 019866; 015219. The public will not know or have any input on where FWS ultimately kills barred owls or whether it should continue killing barred owls even if the first decade of the Program shows little or no benefit to spotted owls.

*Map 1 – Areas Where the Program Authorizes Killing of Barred Owls*
*https://www.arcgis.com/apps/mapviewer/index.html?layers=64c72cf238884de2ac468ba4b86bd686*




Despite authorizing the killing of 450,000 barred owls, there is much the Program does not do. The Program does not eradicate barred owls from the Pacific Northwest or stop new ones from arriving. 000037; 011820. It does not prevent barred owls from

recolonizing sites where barred owls are killed or end competition between barred owls and spotted owls. *Id.*; 001895. The Program does nothing to protect spotted owl habitat or prevent additional take of spotted owls. 011112. FWS acknowledges that in many areas where it will kill barred owls, areas where spotted owl populations are low like Washington and the Oregon Coast Ranges, populations of spotted owls are likely to continue to decline. 012050. The fact that spotted owl populations even declined in Hoopa and Klamath-Union/Myrtle during the Experiment indicates continued population declines should be expected across most areas designated for implementation. *See* 008367; 034349. Further, the Decision ended a prohibition against incidental take of spotted owls by timber harvest on BLM lands in Oregon, which is likely to increase the number of spotted owls killed and displaced in those areas. 001815; BLM_000425. The Decision also authorizes shooting of barred owls on lands where incidental take of spotted owls from timber harvest has been, and will continue to be, allowed, even if spotted owls return after barred owls are killed. 001819. Thus, FWS is authorizing the killing of protected barred owls even in areas where spotted owls cannot live.

The logging industry, the pioneer of barred owl killing, unanimously supports the Decision. *E.g.*, 016032. Logging companies have expressed an interest in implementing the Program on their lands, with the hope that their participation could lead to "incentives," presumably increased allowance for logging and incidental take of spotted owls. *See, e.g.*, 004163-64. While FWS has not committed to offering any specific incentives, it is open to "potential options," and state participants at least discussed "possible incentives." 004469-74. Bown expressed her "intent to explore the potential for safe harbor agreements . . .

when we finish the strategy," but was cognizant that this was "a really hot topic with some of the publics [sic]." 004472.

**STANDARD OF REVIEW**

All claims in this case are governed by the APA. 5 U.S.C. §§ 701-706. The APA requires courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedure required by law." *Id.* § 706(2). Under this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," offered an explanation that conflicts with the evidence before it, "or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The APA also sets forth requirements for agency rulemaking, which is the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). When engaging in rulemaking, the APA requires agencies to publish a notice in the Federal Register, offer interested persons an opportunity to comment, and consider all substantive comments received. *Id.* at § 553

The Supreme Court recently clarified that the APA commands courts, not agencies, to interpret the law. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). The Court held that the APA "specifies that courts, not agencies, will decide *all* relevant questions of law arising on review of agency action—even those involving ambiguous laws—and set aside

any such action inconsistent with the law as they interpret it." *Id.* at 392 (cleaned up). Crucially, the APA "prescribes no deferential standard for courts to employ in answering those legal questions." *Id.* Courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412.

**ARGUMENT**

**A. FWS violated the MBTA and APA and exceeded its discretion in issuing an MBTA permit for the killing of hundreds of thousands of barred owls and doing what it had previously acknowledged "you can't do."**

Early on, FWS realized that the MBTA's prohibition of killing barred owls presented an obstacle. FWS considered trying to remove barred owls in the Pacific Northwest from the MBTA, but concluded that this would be "[v]ery difficult" and "too big of a lift." 020634; 020630. Yet FWS realized that the agency's preferred approach of killing hundreds of thousands of barred owls would not be covered by an existing MBTA permit. 021696. FWS recognized that the scientific collecting permit it had used during the Experiment was inappropriate for long-term population management. 020630. While FWS acknowledged that depredation permits were the "logical option," it did not want to work around the regulations' prohibition on luring birds into shooting range, whether by amending the regulations ("pretty unlikely") or altering the Program's shooting protocol. 020634; 50 C.F.R. § 21.100(c)(3) ("Permittees may not use . . . other devices to lure or entice birds within gun range."). Another alternative considered was using a special purpose permit "as a bridge while new [regulations] are being written," although FWS acknowledged internal advice that a special purpose permit should not be used when another permit would fit the situation and feared "opening the use of these to scrutiny." 020635; 020631-32.

FWS then landed on issuing a regulation creating a new permit to protect certain threatened and endangered species. 020636. However, FWS expressed concern that creating a new permit could prove troublesome when "the courts will point out that we are writing a bunch of regs to get around the [depredation regulation], and that would be problematic program-wide." *Id.* FWS knew that to create this new species protection permit, it would have to issue a new MBTA regulation. *See* 020426. It planned to issue a proposed rule in 2021 and to finalize it the following year. 020428. As notes from a December 2020 meeting reveal, FWS knew that a new regulation was required because existing regulations "don't apply to this." 020410. By June 2021, FWS was envisioning two new MBTA regulations and conducting a NEPA analysis for the regulations. 018716. New MBTA regulations were required because "[c]urrently you can't do this." *Id.*

Then at some unknown point, for reasons absent from the administrative record, FWS decided to forego issuing any new MBTA regulations. For a two-year period, the administrative record contains only a single document discussing an MBTA permit,[2] in which Bown responds to a query about a potential new MBTA permit by indicating FWS would use "the Special Purpose permit, with procedures for a[n] Agency Species Protection approach." 012005. Bown does not explain how she knew exactly the type of permit FWS would obtain when a different division of FWS, the Migratory Bird Program ("FWS Birds"), had yet to even create the type of permit Bown referenced. *See id.*

[2] Counsel for Friends of Animals queried why the administrative record contains only one document discussing the MBTA between late 2021 and February 2024. After counsel for Defendants declared that they considered all other MBTA documents in that period to be deliberative, Friends of Animals advised that it would file an appropriate motion if Defendants later seek to introduce any of those documents or to explain them via an improper declaration.

Subsequently, on February 21, 2024, without conducting a NEPA analysis, issuing a new regulation, considering public comments, or even notifying the public, FWS purported to approve Special Purpose Agency Species Protection Permit Processing Procedures. 022487. This isolated document does not explain who voted on these procedures, what the vote was, or what authority the unidentified voters had to approve procedures for a new permit. *See id.*

FWS then applied for an MBTA special purpose permit in June 2024. 000386-95. There is no mention on the application form or the information entered therein that FWS was applying for a "species protection" permit. *Id.* In its review of the application, FWS stated without citation that it could issue an "MBTA Special Purpose Agency Species Protection Permit." 000022. Absurdly, FWS Birds proceeded to analyze whether the Program met the Procedures it had created specifically for the Program. 000031-35. Unsurprisingly, FWS found that the Program did in fact meet these tailor-made specifications. *Id.* FWS then issued the requested MBTA permit on August 23, 2024, with the header identifying the permit as "Special Purpose Agency Species Protection." 000380-82.

Regardless of whether the MBTA permit is considered a special purpose permit or a new species protection permit, FWS violated the law in issuing the Permit.

**1. The MBTA and underlying conventions prohibit FWS from issuing an MBTA permit for the Program.**

The MBTA generally prohibits the taking or killing of native migratory birds, "[u]nless and except as permitted by regulations." 16 U.S.C. § 703(a). "Subject to the provisions and in order to carry out the purposes of the conventions, referred to in section 703 of this title, [FWS must consider multiple factors] to determine when, to what extent, if

at all, and by what means, it is compatible with the terms of the conventions to allow" take of migratory birds. *Id*. at § 704(a). Regulations authorizing the take of migratory birds shall only "become effective when approved by the President." *Id.* And irrespective of FWS's limited authority to issue regulations for permits, the MBTA flatly prohibits the use of bait in attempting to take any migratory bird. *Id.* at § 704(b). The MBTA thus does not grant FWS unilateral authority to prescribe the methods and manner of take of migratory birds. And crucially, the Permit's premise that barred owls are an invasive species is plainly contrary to the MBTA's text.

**a. The Permit is based on FWS arbitrarily defining barred owls as invasive.**

The Permit is arbitrary and inconsistent with the MBTA because it is premised on classifying barred owls as an invasive and non-native species and falsely claims that they meet the definition of an invasive species. *See* 000022 ("The purpose of the proposed activity is to reduce populations of non-native barred owls."); 000036 ("The Service notes in Appendix 1 of the Strategy that the barred owl in western North America meets the definition of an invasive species in E.O. 13751.").

From the outset, FWS conceived of the Program as one to manage "the invasive barred owl." *See, e.g.*, 021810. The agency's conception of barred owls as "invasive" was consistent and central to the development of the Program. The Record of Decision describes the proposed action as addressing the threat "from the non-native and invasive barred owl" on the first page and uses the term "invasive" at least fifty times. *See* 000006.

Although it assumed from the beginning that barred owls were an invasive species and let this assumption guide its planning, FWS delayed addressing why barred owls were invasive until 2022. *See* 017363. This was not an exercise in determining *whether* barred

owls met the definition of an invasive species; it was an exercise in justifying FWS's long-held assumption that they did. *See id.* ("I will be creating a short 'white paper' addressing the elements of this concluding [sic] our determination that barred owls are an invasive species."). Robin Bown readily admitted that whether barred owls actually met the federal definition of "invasive species" was "not a big deal for our work" since FWS had assumed barred owls were invasive from the beginning. *See id.* However, Bown admitted that FWS was "required" to use the federal definition of "invasive species." 022014.

In notes from a September 2020 meeting, Bown acknowledged that FWS was "[n]ot able to say" that barred owls were "introduced." 021696 ("Not really able to say that this is an invasive species."). At one point, Bown emailed FWS's Regional Invasive Species Coordinator, Paul Heimowitz, asking for a source supporting the notion that climate change can cause an "introduction." 017154. Heimowitz responded that he was aware of no such sources and explained that some papers "recognize the challenges of using invasive to describe the narrower realm of native species that become harmful after spreading due to human-mediated climate change," linking to a paper. 017153. The administrative record contains no evidence of a response from Bown or even the study linked to about "the challenges" of defining species like barred owls as invasive, so FWS apparently never considered it. FWS's classification of barred owls suffers from major flaws.

First, Congress obviously did not share FWS's strained view that barred owls in the Pacific Northwest are an invasive species. Congress defined "native" to mean any migratory bird species "occurring in the United States . . . as the result of natural biological or ecological processes," 16 U.S.C. § 703(b)(2)(A), and defined "introduced species" as a "species that occurs in the United States . . . solely as a result of intentional or unintentional

human-assisted introduction." *Id.* at § 703(b)(2)(B). Because barred owls are native to the United States, they are indisputably protected under the MBTA. 50 C.F.R. § 10.13.

Congress certainly could have defined "native" more narrowly or defined "introduced" more broadly. But because Congress chose to draft the MBTA as is, it intended that any species native to the United States that expands its range to somewhere new in the United States, even if due in some part to humans, should be considered a "native" rather than an "introduced" species. *See id.* at § 703(b). Killing large numbers of one species the MBTA considers native on the basis that they are non-native and invasive is thus plainly contrary to the MBTA and is unreasonable. FWS never even considered whether a permit for the Program was inconsistent with the MBTA's definitions of "native" and "introduced." 000036-41.

Second, FWS has historically considered range expansion to be natural, even when partially abetted by human activity. *E.g.*, 70 Fed. Reg. 372, 373 (Jan. 4, 2005). For example, in explaining which bird would be listed under the MBTA, FWS declared that "we consider landscape changes caused by agriculture and other forms of human development to be *natural ecological processes*." *Id.* (emphasis added). Although such "activities may make the environment more amenable for some species . . . to expand their ranges and colonize these jurisdictions. . . . [i]n the absence of direct human intervention, these new arrivals (*e.g.*, cattle egrets) are considered to be native." *Id.* FWS's determination that barred owls' range expansion constituted an introduction contradicted its past practice, and FWS's failure to explain this departure from past practice was arbitrary. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

Third, FWS misinterpreted Executive Order 13751 on which it relies to define barred owls as invasive. *See* 000036 (claiming that "the barred owl in western North America meets the definition of an invasive species in E.O. 13751."). Agency interpretations of an executive order must be reasonable, and unreasonable interpretations must be overturned. *See Montana Wild. Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013). "The interpretation of an Executive Order begins with its text, which must be construed consistently with the Order's object and policy." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) (cleaned up). The statutory canon of *inclusio unius est exclusio alterius*—the inclusion of one is the exclusion of the other—applies to executive orders. *See id.* at 1239 (by specifically excluding grants necessary for law enforcement, executive order directed cabinet officials to cut all other grants). Historically, while courts have deferred to agencies' reasonable interpretations of executive orders, agency interpretations that are "plainly erroneous or inconsistent with the order" cannot be sustained. *See id.* at 1242 (quoting *Kester v. Campbell*, 652 F.2d 13, 15-16 (9th Cir. 1981)). After *Loper Bright*, it is doubtful whether such deference remains the law. *See* 603 U.S. at 392 (The APA "specifies that courts, not agencies, will decide *all* relevant questions of law arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions." (cleaned up)). Regardless of whether *Loper Bright* applies, this Court could not defer here because FWS's interpretation of Executive Order 13751 in the Decision is unreasonable and must be overturned.

Executive Order 13751 seeks to prevent the introduction and spread of invasive species and minimize resulting harms. It defines an "Invasive species" as "a non-native organism *whose introduction* causes or is likely to cause economic or environmental harm, or harm to human, animal, or plant health." Exec. Order No. 13751 at § 2(e) (emphasis added). "Introduction" is also defined in the Executive Order and "means, as a result of human activity, the intentional or unintentional escape, release, dissemination, or placement of an organism into an ecosystem to which it is not native." *Id.* at § 2(d). It was unreasonable for FWS to determine in the Decision that barred owls meet the definition of "invasive species" in Executive Order 13751. 000061.

FWS never provided a reasonable explanation of how barred owls' presence in the Pacific Northwest was due to an "introduction." *See* Exec. Order No. 13751. In attempting to explain how their range expansion constitutes an "introduction," Bown wrote that their presence is "the result of a breakdown of the barrier previously established by conditions in the northern Great Plains and Northern Boreal Forest" and that this process was "human-facilitated expansion – dissemination." 017132. That was the entirety of FWS's determination of why it considered this an "introduction." In a later draft, Bown explained that these conditions were "[c]reating the habitat necessary for movement across the pervious [sic] barrier" and then listed "the most likely and reasonable explanation" for barred owls' presence in the Pacific Northwest, including "[f]ire reduction" and "[c]limate change." 016835. When Bown did eventually share the invasive white paper more broadly, she ordered "DO NOT send me edits on this and I don't want input either." 013031. This white paper was eventually incorporated into the Record of Decision. 000122-31.

Commenters highlighted the problems with defining barred owls as an invasive species. 015846 ("[W]e will only do more harm by trying to manage which species move in order to find better resources or appropriate climates" if species such as barred owls are considered invasive.); 016055 (Audubon Society of Portland calling "invasive" term a "distraction" and "discourag[ing]" FWS from using it). The Oregon Department of Fish and Wildlife noted that calling barred owls invasive was "problematic." 015735-36. FWS never addressed these concerns, simply asserting that its definition was consistent with Executive Order 13751 and declaring that "[t]he concept of invasive species is widely accepted by governmental agencies." 001972; 015735-36.

FWS's determination that barred owls are an invasive species is contrary to the plain language of Executive Order 13751. Barred owls did not arrive in the Pacific Northwest by way of "introduction." FWS knew that barred owls were not "introduced," 021696, but then proceeded to conclude against all reason that they were. FWS never explained how the gradual breakdown, through fire reduction and climate change, of the natural barrier allegedly preventing previous expansion of barred owls constituted an "introduction." *See*, *e.g.*, 016835. The agency cited no example or source that supported anything similar to barred owls' expansion into the Pacific Northwest being considered an "introduction."

Since Executive Order 13751 includes "escape," "release," "placement," and "dissemination" but nothing else in the definition of introduction, the canon of *inclusio unius est exclusio alterius* means that only those things constitute an "introduction." *See City & Cty. of San Francisco*, 897 F.3d at 1239. Seemingly aware that barred owls did not arrive in the Pacific Northwest through "escape," "release," or "placement," FWS nevertheless

asserted that their range expansion constituted "dissemination." 017132. But FWS never explained how barred owls' own gradual migration westward over decades can be considered "dissemination." Dissemination is not defined in the executive order but is commonly understood to mean "the act or process of disseminating or spreading something," and disseminating is understood to mean "to spread abroad as though sowing seeds" or "to disperse throughout." Dissemination, merriam-webster.com, https://www.merriam-webster.com/dictionary/dissemination; Disseminating, https://www.merriam-webster.com/dictionary/disseminating (last visited Feb. 18, 2026). Like the other terms in the definition of "introduction," dissemination requires human action that directly brings a non-native organism to a new habitat; it does not include indirect habitat manipulation or range expansion, regardless of whether such range expansion can be attributed to human-induced environmental changes.

There is no evidence in the administrative record that barred owls were introduced to the Pacific Northwest, whether by dissemination or otherwise. Livezey refers to the barred owl's westward movement solely as a "range expansion" and states, "Nothing in the literature suggested Barred Owls were introduced to western North America by humans." 046444. Despite using the term "invasion" to describe barred owls' presence in the Pacific Northwest, the authors of one study make clear that this is a result of "range expansion" and should be considered "natural." 048968. One proponent of barred owl removal, whom FWS worked with in developing the Program, *see, e.g.*, 020142-43, explained why barred owls are not an invasive species: whereas invasive species have traditionally been viewed as species "introduced into a novel environment, intentionally or unintentionally, by humans," barred owls are at most a "native invader; a species that shifts its range—

possibly facilitated by human action—into a nearby ecological community." 023292; *see also* 075253. Importantly, for a species to be invasive under Executive Order 13751, it must not only be introduced, but must also be non-native. E.O. No. 13751 § 2(e).

The definition of "pathway" elsewhere in Executive Order 13751 further supports the notion that "introduction" and "dissemination" are not intended to include indirect human activity like climate change. "Pathway" is defined as "the mechanisms and processes by which non-native species *are moved* . . . ." E.O. No. 13751 § 2(g) (emphasis added). The executive order thus concerns species that "are moved" by direct human activity, not species that move on their own.

The use of the singular "an organism" in the definition of "introduction" also suggests that the executive order pertains to an abrupt movement by an individual or discernable group. *Id.* § 2(d). In contrast, barred owls gradually expanded from eastern North America to the Pacific Northwest over generations. There is no evidence in the administrative record that a single barred owl ever moved from its habitat in eastern North America to the Pacific Northwest during its lifetime.

FWS's unreasonable determination that barred owls are an invasive species, if allowed to stand, would have grave consequences in a world so thoroughly impacted by human activity. It is difficult to conceive of a species expansion going forward that could not be attributed in some way to human activity, whether climate change or something else. And indeed, FWS now suggests that it may "manage" other species that expand their range and alter ecosystems as a result of climate change. *See* 021900. Strangely, FWS included a disclaimer of dubious effect in its invasive species analysis that "[i]t should not be considered a policy decision or applied directly to other species or situations, as each

situation is unique." 000122. Of course, FWS cannot pick and choose to interpret an executive order inconsistently and the disclaimer cannot save FWS's unreasonable interpretation.

FWS seemingly never considered the larger implications of considering barred owls an invasive species, preferring to pretend that it could pick and choose how to interpret Executive Order 13751. Even when FWS's Regional Invasive Species Coordinator pointed out that many consider it problematic to label species that move in response to climate change as "invasive," FWS failed to even consider the paper he linked to, much less actually analyze whether interpreting the executive order in this way was problematic. *See* 017153. FWS's complete failure to consider this important aspect of the problem was itself arbitrary and requires vacatur. *State Farm*, 463 U.S. at 43 (1983) (agency action violates the APA when the agency "entirely failed to consider an important aspect of the problem").

Executive Order 13751 does not order agencies to reduce the population of species who move in response to climate change. FWS's classification of barred owls as invasive contradicts the plain language of both the MBTA and the executive order. Thus, the Decision is unreasonable, contrary to law, and must be overturned.

**b. The Permit violates additional aspects of the MBTA and conventions.**

FWS Birds failed to consider whether issuing a permit for the Program was consistent with the MBTA and compatible with the underdlying conventions. *See* 16 U.S.C. § 704(a). Although it purported to determine that a permit was consistent with the MBTA and its conventions, 000041, the entirety of its preceding analysis was limited to whether the Program "threatens a population." 000036-41. While this is necessary to consider before issuing an MBTA permit, it is not sufficient. Simply because a permit would not

"threaten[] a population" does not mean that it is necessarily consistent with the MBTA and the conventions. For a number of reasons, this Permit was not.

For instance, the Convention with Mexico authorizes the parties to permit "the utilization of said birds rationally for purposes of sport, food, commerce, and industry." Convention between the United States of America and Mexico for the Protection of Migratory Birds and Game Animals art. 1, Feb. 7, 1936, 50 Stat. 211, T.S. No. 912. Nowhere in these limited circumstances does the Mexico Convention permit FWS to allow take to manage competition between bird species. The Permit is thus inconsistent with the Mexico Convention.

The Permit also plainly violates the MBTA's prohibition on baiting. *See* 16 U.S.C. § 704(b). The Permit expressly purports to allow permittees to "use decoys, bait, or other devices to lure birds within trap range" without limitation. 000381. This followed FWS's description in the permit application that, while it primarily intends to shoot barred owls, it would also capture and euthanize barred owls in certain circumstances with the use of a call and a plastic owl decoy in a Dho-gaza net and "live mouse bait" in foot-snare pan-traps. 000389. The Permit's inexplicable allowance of baiting is arbitrary, violates the MBTA, and requires vacatur.

**2. FWS violated MBTA regulations in issuing a special purpose permit.**

Pursuant to the MBTA, FWS has issued certain regulations that authorize the issuance of permits for take of migratory birds in limited situations and with some specific restrictions. MBTA permits authorize take for activities such as rehabilitation, scientific collection, and taxidermy. 50 C.F.R. §§ 21.63-21.95. A separate subpart of the MBTA regulations prescribes the requirements for permits for "Depredating, Overabundant, or

Otherwise Injurious Birds." 50 C.F.R. Part 21–Subpart D. The regulations make clear that "a depredation permit is required before any person may take, possess, or transport migratory birds for depredation control purposes." 50 C.F.R. § 21.100(a); *see also Fund for Animals v. Kempthorne*, 538 F.3d 124, 128 (2d Cir. 2008) (explaining that depredation permits and orders are the authorized methods of take "[w]hen migratory birds cause, or are about to cause, such acts of 'depredation'"). Notably, the depredation permit regulation prohibits the use of "concealment" and "decoys, duck calls, or other devices to lure or entice birds within gun range." 50 C.F.R. § 21.100(c)(3).

Another MBTA regulation authorizes the issuance of permits for "special purpose activities . . . which are otherwise outside the scope of the standard form permits of this part." 50 C.F.R. § 21.95. The regulation reemphasizes that it applies to "purpose[s] not covered by the standard form permits." *Id.* § 21.95(a). As the Ninth Circuit has held, the special purpose permit regulation is "a narrow exception to the MBTA's general prohibition on killing migratory birds" that "authorize[s] activities not otherwise permitted by the regulations." *Turtle Island Restoration Network v. U.S. DOC*, 878 F.3d 725, 734 (9th Cir. 2017). The regulation requires a "sufficient showing of benefit to the migratory bird resource, important research reasons, reasons of human concern for individual birds, or other compelling justification." C.F.R. § 21.95. Furthermore, this regulation specifies that applications for a special purpose permit must include a "delineation of the area in which [the project] will be conducted." 50 C.F.R. § 21.95(b)(1). Thus, the regulation both limits special purpose permits to a particular area and requires an applicant to describe that area with specificity. FWS acted arbitrarily and in excess of its authority in issuing a special purpose permit for several reasons.

First, FWS could not issue a special purpose permit for killing barred owls because the purpose of the Program is to kill barred owls it considers depredating, overabundant or otherwise injurious. 000115 (Program monitoring focuses on whether Program has "reduced the abundance of" barred owls). This is precisely the purpose covered by standard form depredation permits. 000025 ("In the past, the Service most commonly authorized the take of migratory birds to protect species of concern under MBTA Depredation Permits."). *See also* 022470 (Justifications for depredation permits include take of migratory birds that pose "threats to recovery of protected wildlife."). Special purpose permits cannot be issued for depredation purposes because they are only available for activities "outside the scope of the standard form permits of this part" and "activities not otherwise provided for" by other MBTA permits. 50 C.F.R. § 21.95. And killing barred owls because FWS believes that their presence is harming spotted owls is not "outside the scope" of a depredation permit. *See id.* at § 21.100(a). FWS addressed this situation in a previous rulemaking. 75 Fed. Reg. 9282, 9298 (Mar. 1, 2010). In response to comments, FWS clarified that depredation permits—not special purpose permits—are the appropriate mechanism for dealing with situations where MBTA listed birds are having a "deleterious impact on native wildlife." *Id*. In fact, when considering what type of permit to issue for the Program at issue here, FWS itself acknowledged that a depredation permit was the "logical option." *See* 020634. The regulation for depredation permits even makes clear that "a depredation permit is required before any person may take . . . migratory birds for depredation control purposes." 50 C.F.R. § 21.100(a). FWS's entirely unsupported assertion in its permit review that depredation permits are "intended to take individual birds to eliminate or reduce specific damage at a particular property," 000025, does not

override the unambiguous regulatory language, and is contradicted by its past practices. *See, e.g.*, 84 Fed. Reg. 69762 (Dec. 19, 2019) (authorizing annual take of up to 74,396 double-crested cormorants across 37 states pursuant to depredation permits after authorizing take of 51,154 the previous year).

FWS cannot ignore these regulatory restrictions simply because the depredation permit regulation would not allow it to implement the Program exactly how it would like. Clearly, FWS avoided a depredation permit because of the regulation's prohibition on the use of calling or luring birds for such permits. *See* 50 C.F.R. § 21.100(c)(3); 020634. But FWS could not turn shooting barred owls for depredation control into something eligible for a special purpose permit by designing a shooting protocol to include calling. To conclude otherwise effectively nullifies the MBTA regulations.

In granting the permit, FWS Birds asserted that the Program was "not appropriate" for a depredation permit. 000025. But whether the specific protocol is "appropriate" for a depredation permit does not mean that the Program is "outside the scope" or "not otherwise provided for" by other MBTA permits. *See* 50 C.F.R. § 21.95. What matters is the **purpose** of the permit, not the method used to take protected birds. 50 C.F.R. § 21.95(a) (providing that special purpose permits are for "any purpose not covered by the standard form permits of this part"). Here, the purpose of the Permit is clearly the killing of barred owls for depredation control.

A depredation permit, not a special purpose permit, is the only possible MBTA permit for large-scale killing of one protected bird species to help other wildlife. None of the existing justifications for special purpose permits even envision killing birds. *See*

022468-69. Similarly, none of those existing justifications envision take on such a large scale. *See id.*

Next, it was also arbitrary for FWS Birds to determine that FWS made "a sufficient showing" of a "compelling justification." 50 C.F.R. § 21.95. In concluding that the applicant made a compelling justification, FWS undertook no independent analysis of whether the Program was necessary or appropriate and instead simply parroted what FWS represented in its application and in the Program's documents. 000025-26; 000031-35. For instance, in reviewing the supposed effectiveness of the Program, FWS Birds repeated what FWS had represented, but made no independent assessment of whether the Experiment had been successful. *See* 000030, 000034. FWS Birds, however, could not delegate the responsibility of assessing the effectiveness of the Experiment and the Program to the applicant. FWS Birds had to analyze the results of the Experiment and determine whether the Program would sufficiently benefit spotted owls.

FWS's "compelling justification" finding also contradicts its own Recovery Plan, which directs that efforts to address barred owl competition "must be conducted simultaneously" with efforts to address habitat loss, 068238. There is no compelling justification for killing barred owls in areas where suitable spotted owl habitat is not protected. Lethal removal cannot promote the survival of spotted owls if the habitat necessary for occupancy and reproduction continues to be degraded. As one study noted, "[i]n most study areas, habitat effects on expected Northern Spotted Owl territorial occupancy are actually greater than the effects of competition from Barred Owls." 075408.

Rather than incorporate habitat protection into the Program, the EIS reassures timber interests that economic impacts will be "minimal" because habitat destruction may

continue outside nesting season in some areas, 001816, and existing prohibitions on incidental take of spotted owls would be lifted in other areas, thereby allowing additional habitat destruction. 001815. Thus, FWS authorized lethal removal in areas where it has failed to secure the habitat protections it concedes are critical. The Recovery Plan further states that before implementing long-term barred owl removal, FWS "needs to be confident this removal would benefit spotted owls." 068238-39. As explained above, the results of the Experiment provide no such confidence; spotted owl populations continued to decline where barred owls were killed. 021834, *supra* at pp. 6-9.

Additionally, issuing a special purpose permit for the Program violated FWS's internal handbook for special purpose permits. Agency handbooks offer "persuasive authority for courts determining what procedures are appropriate." *Garcia v. INS*, 208 F.3d 725, 733 n.5 (9th Cir. 2000). An agency's unexplained departure from its handbook or policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the [APA].") *Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 981.

FWS's Migratory Bird Permitting Handbook, updated in April 2024—months after the procedures vote—does not mention "species protection" at all. 022448-86. This Handbook lists nine separate justifications for special purpose permits, none of which reference or authorize species protection permits. 022468-70. FWS could thus only issue a special purpose permit for one of those nine specific justifications. It was arbitrary for FWS to violate its handbook by issuing a special purpose permit for something else entirely, with no explanation. Moreover, FWS's handbook explains that a depredation permit applicant's failure to implement reasonable non-lethal methods or to propose a long-term solution does not meet the minimum "valid justification," 022470, which is required for all

permits. 50 C.F.R. § 13.21(b)(3). Because the Program fails to meet this minimum requirement, it cannot satisfy the more demanding "compelling justification" standard required for special purpose permits. *See* 50 C.F.R. § 21.95.

**3. FWS violated the APA by creating a new MBTA permit rule without adhering to rulemaking requirements.**

The APA defines a rule as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). "Rule making" is the "agency process for formulating, amending, or repealing a rule." *Id.* at § 551(5). When an agency engages in rulemaking, the APA requires a particular process, namely publishing a notice in the Federal Register, offering interested persons an opportunity to comment, and considering any substantive comments received. *Id.* at § 553; *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 763-64 (1969).

The APA exempts only a limited number of rules, such as interpretive rules, from notice-and-comment requirements. 5 U.S.C. § 553(b)(4)(A). But for legislative rules, an agency's failure to comply with notice-and-comment rulemaking renders the rule invalid. *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). Courts "need not accept" an agency's characterization of a rule as interpretive "at face value." *Id.* The Ninth Circuit has explained that "legislative rules create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Id.* (cleaned up). "An agency may not escape the requirements of § 553 by labeling its rule" something else. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) (citing cases). "An agency action that sets forth legally binding requirements . . . to obtain a permit or license is a legislative rule." *Nat'l. Mining Ass'n. v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014).

FWS engaged in a rulemaking when it purported to create a new type of MBTA permit, a species protection permit. Because the creation of a species protection permit "create[d] new rights," it was a substantive rule that required FWS to undertake notice-and-comment rulemaking. *See Hemp Indus.*, 333 F.3d at 1088. FWS's failure to do any of the things the APA requires for rulemaking—notice, an opportunity to comment, and actual consideration of any substantive comments—renders both the purported creation of the species protection permit and the specific Permit here invalid. *See id.* at 1087.

Even if a species protection permit is considered a type of special purpose permit, creating that type of special purpose permit was still a rulemaking as there was no basis to issue a special purpose permit for species protection before February 2024. There is no reference to a "species protection permit" anywhere in the MBTA itself, MBTA regulations, or even agency guidelines. *See* 022468-70. Because there was no basis to issue an MBTA permit for species protection before February 2024, FWS's attempt to create a new type of special purpose permit "create[d] new rights" and was thus a legislative rule. *See Hemp Indus.*, 333 F.3d at 1088.

If FWS wished to create a new type of MBTA permit to cover species protection issues like the one at issue here, it had to undertake a rulemaking. FWS knew this, as it admitted that "[c]urrently you can't do this" because "[c]urrent regulations and depredation permits don't apply to this." 018716; 020410. It also recognized that the way to create such a permit was by issuing new regulations. 020426. But then for reasons that it never explained, FWS purported to create the new type of permit while foregoing the process for rulemaking altogether. *See* 022487-90.

FWS has undertaken rulemaking when it has created new types of special purpose permits that are not for the benefit of the birds taken. *E.g.*, 72 Fed. Reg. 69705 (Dec. 10, 2007) (abatement); 70 Fed. Reg. 59710 (Oct. 13, 2005) (educational use).

**B. FWS violated NEPA and the APA when it failed to take a hard look at the ethical impacts of the Program and the impacts to individual barred owls.**

NEPA requires agencies to prepare a detailed EIS before undertaking a major federal action that significantly affects the human environment. 42 U.S.C. § 4332(C). Courts reviewing an EIS must consider "whether the agency adequately considered a project's potential impacts and whether the consideration given amounted to a 'hard look' at the environmental effects," which includes "a discussion of adverse impacts that does not improperly minimize negative side effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006). NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cty. Infrastructure Coalition v. Eagle Cty.*, 605 U.S. 168, 177 (2025).

NEPA also requires that agencies consider environmental "values" in decision-making. 42 U.S.C. § 4332(2)(B). This unprecedented Program—authorizing the killing of more than 450,000 federally protected barred owls—implicates profound ethical and ecological values, such as the value of individual animals and the value of maintaining ecosystems at a specific historical baseline. FWS failed to weigh the values at stake or acknowledge which values were being favored, thus overlooking important aspects of the environmental impacts that are key to informed decision-making.

Impacts to the "human environment" include impacts on animals themselves, not just impacts to landscapes or species survival. *See, e.g.*, *Am. Horse Prot. Ass'n v. Andrus*, 608 F.2d 811, 814 (9th Cir. 1979). However, FWS failed to consider impacts to the welfare of

individual animals under the Program. It did not consider any harm-benefit ratio, including the harm of killing over 450,000 barred owls compared to the limited benefit, if any, to spotted owls. *See* 002697 (final report from Dr. Lynn noting the need to consider "[b]alancing the harm done to individuals against the benefits to a group."). It also failed to consider the impacts on barred owls that are not killed, including owls that were non-fatally shot or trapped, monogamous mates, and orphaned owlets. For example, even though FWS knew it was a concern, the EIS did not include any evaluation of the harm to nestlings that may be abandoned when their parents are killed and so left to starve and suffer. *See, e.g.*, 009446, 016570. *See also Am. Wild Horse Pres. Campaign v. Zinke*, 2017 U.S.Dist.LEXIS 161599, at *27 (D. Idaho Sep. 29, 2017) (holding that agency violated NEPA by failing to take a hard look at how action affects the behavior and characteristics of wild horses).

FWS also failed to consider how the unprecedented scope and duration of the Program impacts the values and ethical issues at play. Likewise, it failed to consider how the lack of success in the Experiment (see section C of Factual Background) should factor into long-term management. In the EIS, FWS acknowledged the value of information from the Group, which FWS convened to consider the ethical impacts of the Experiment, claiming "we considered and continue to rely on this as we progress from the experiment to management." 001826. However, the record contradicts FWS's conclusory statements and demonstrates that FWS disregarded the Group's advice regarding long-term management proposals.

The final report from the ethics consultant who FWS hired to lead the Group, Dr. William Lynn, described how there were common values among the diverse stakeholders

in the Group and urged FWS to take the following actions before managing barred owls in the future: "Conduct periodic ethics reviews of wildlife policy and management practices," "Continue to develop non-lethal methods of management," and "Establish humane endpoints for all experiments on wildlife." 002709-10. Dr. Lynn did not view the Group's work as concluding the ethical questions raised by killing barred owls to save spotted owls. 002670 ("I make no pretense, then, that this brief constitutes a final, certain and unquestionable interpretation of the ethics of barred owl management."). The report emphasized the need to reconsider the ethical issues before adopting any kind of long-term killing of barred owls:

> [T]he USFWS should also re-review the ethical implications. The scale and extent of barred owl removal as part of a post-experimental management plan may be be [sic] quite different than that of the experiment itself. Those differences deserve ethical evaluation.

002697. The report also explained how understanding these issues was consistent with two of the main purposes of NEPA, "improving decision-making in environmental policy, and facilitating broad public participation in those decisions." 002669; *see also* 002709 ("Science and ethics are complementary and equally necessary to understand the implications of barred owl removal. Reverence for life is a broadly shared value amongst those concerned with barred owl management.").

Yet FWS never considered how the ethical impacts changed drastically from the experimental killing of 2,500 barred owls as a part of an experiment to the Program that calls for killing of hundreds of thousands of barred owls as part of long-term "management." The record contains no explanation for FWS's failure to consider these important issues. While the EIS contains a page on Ethical Considerations, FWS merely pointed to its consideration of ethical issues for the Experiment and otherwise threw up its

hands, stating that "individual values will lead to different responses" and eschewing "more detailed analysis" because ethical considerations did not differ between the action alternatives. 001826-27. FWS otherwise made inconsistent statements about the need to consider ethical issues. *See* 001970-71 (the public's "ethical concerns . . . do not require analysis under NEPA"); 001972 ("We do not believe an [ethics] committee . . . is necessary to ensure consideration of ethical issues . . . .").

FWS ignored repeated calls to seriously consider the numerous ethical issues implicated by the thirty-year Program, which include the ramifications of justifying the killing of barred owls by defining them as an invasive species. During an early strategy meeting, some members proposed "'Bring[ing] in' folks who have been thinking about barred owl/spotted owl issue but are not part of this team" such as "some ethicists." 021508. The public urged FWS to prioritize detailed study of ethical questions. *E.g.*, 016106; 016051; 015846. A comment from some of the Intervenors and their current counsel pushed FWS to "discuss the ethical dilemma inherent in the lethal control of one species of wildlife to conserve native wildlife. . . . in depth." 016097. Tellingly, during a public meeting for the draft EIS, Bown responded to the ethical concerns of attendees by pointing to the Group from the Experiment but did not point to anything FWS did during development of the Program. 022016.

Weeks before the Record of Decision was published—but long after the Program had been decided—Bown forwarded Dr. Lynn's ethics brief from the Experiment to select team members for their "leisure reading" without any explanation. 002667-729. Separately, Bown circulated a New York Times Opinion piece criticizing the Program. 022419-022422. Dr. Dumbacher, an ornithologist, responded with many thoughts,

including "Why is there no ethicist on the BOST? Is it time to include one?" 002347. However, FWS never explained why it did not include an ethicist in its discussions over the Program.

This is not merely an academic exercise. The Program's plan to kill hundreds of thousands of species, altering species composition across the Pacific Northwest, raises serious ethical and ecological concerns. *See, e.g.* 022421 ("Constant killing to keep ecosystems from changing in an already volatile world is a dystopian, rear-guard conservation strategy."); 002698 (emphasizing the need to consider the success of the Experiment before deciding on long term lethal program because marginal benefits do "not justify an unlimited killing of other creatures"). FWS's refusal to consider these concerns in detail is inconsistent with NEPA's precautionary, or "think before you leap," approach and frustrated NEPA's policies to achieve "productive and enjoyable harmony between man and his environment;" and to avoid "undesirable and unintended consequences." 42 U.S.C. §§ 4321, 4331(b)(3). Had FWS meaningfully considered these ethical issues it could have reached a different conclusion about which course of action to take.

Finally, Friends of Animals incorporates and adopts by reference the additional NEPA arguments set forth in Animal Wellness Action's and the Center for Humane Economy's Motion for Summary Judgment.

**C. Defendants violated the Wilderness Act by authorizing widescale killing of barred owls in wilderness areas.**

The Wilderness Act authorizes Congress to establish wilderness areas, which are places "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). The Wilderness Act requires agencies to preserve the "wilderness character" of wilderness areas. Commercial

enterprises, roads, and any "structure or installation" are prohibited within wilderness areas "except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter." *Id.* at § 1133(c). The Wilderness Act includes a limited number of "special provisions," which allow "control of fire, insects, and diseases," but do not mention population control of any other species. *Id.* at § 1133(d)(1).

The Ninth Circuit has previously held that FWS's construction of two water tanks in a wilderness area, which FWS believed were instrumental to conserving bighorn sheep, violated the Wilderness Act. *Wilderness Watch, Inc. v. U.S. FWS*, 629 F.3d 1024, 1027, 1040 (9th Cir. 2010). The Court found that the purpose of the Wilderness Act with respect to conservation was ambiguous. *Id.* at 1033. It ultimately held that despite the water tanks helping bighorn sheep recover, FWS violated the Wilderness Act because it did not explain how those structures were "necessary" for bighorn sheep recovery. *Id.* at 1039. "When there is a conflict between maintaining the primitive character of the area and between any other use, the general policy of maintaining the primitive character of the area must be supreme." *High Sierra Hikers Ass'n v. U.S. Forest Serv.*, 436 F. Supp. 2d 1117, 1131 (E.D. Cal. 2006) (cleaned up).

The Program is completely antithetical to untrammeled wilderness areas that are pristine, natural, and free from human intervention. Rather, the Program is intentional human intervention into natural competition between species through repeated incursions to shoot one species of owl. FWS acknowledges that the Program has a negative effect on wilderness character in at least five different ways. 001791-92. However, without offering any additional explanation, FWS simply asserts that the "overall effect" of the Program

"would be to preserve wilderness character in the long term by preventing the extirpation of a native species in wilderness areas." 001793.

Barred owls arrived in wilderness areas in the Pacific Northwest neither directly nor intentionally because of humans. And after flying to these areas on their own accord over generations, nature has determined the response of the wilderness areas. The fact that the Wilderness Act specifically allows for "control of fire, insects, and diseases" without mentioning controlling other species manifests Congress's clear intent that agencies not regulate species competition within wilderness areas. 16 U.S.C. § 1133(d)(1); *Route v. Garland*, 996 F.3d 968, 982 (9th Cir. 2021) (holding that under "the doctrine of *inclusio unius est exclusio alterius* (the inclusion of one is the exclusion of the other), the mention of only specific exemptions" dictates that no other exemptions are applicable (cleaned up)). Regardless of Defendants' views of the presence of barred owls in wilderness areas, the Wilderness Act dictates that the way to keep these areas untrammeled is to refrain from heavy-handed species selection through killing.

The Decision further violates the Wilderness Act because it authorizes the placement of autonomous recording units (ARUs) in wilderness areas to identify barred owls to shoot. *E.g.*, 000367. FWS indicated that ARUs would be used in wilderness areas, *see* 001781, and in adopting the Program in full, BLM seemingly authorized their use in the wilderness areas it administers. *See* BLM_000004. But "prohibited activity within a wilderness area," even if done for the conservation of a native species, "is permitted only if both necessary and the minimum required to achieve the purpose of the Act." *Wilderness Watch v. U.S. FWS*, 685 F. Supp. 3d 950, 963 (D. Mont. 2023). FWS did not determine that

use of ARUs is necessary or the minimum required to achieve the Wilderness Act's purpose. *See* 001793.

The Program also diminishes the wilderness experience for anyone who hears recorded barred owl calls emitted via megaphones, hears shooting of barred owls, sees ARUs, or witnesses a barred owl shooting or its aftermath, including coming across a barred owl carcass. *See* 001791. The Wilderness Act "seeks to provide the opportunity for a primitive wilderness experience as much as to protect the wilderness lands themselves from physical harm." *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1093 (11th Cir. 2004). The Program deprives visitors to numerous wilderness areas of a primitive wilderness experience.

In issuing their Decisions, Defendants failed to seriously considered whether shooting barred owls to manage their competition with spotted owls violated the Wilderness Act. FWS apparently considered a Reference Manual for Wilderness Stewardship. 022582-610. But FWS overlooked key aspects of that Manual, which mandate against the heavy-handed human management of the Program in wilderness areas. For example, key factors in the definition of "untrammeled" include the "absence of rationally planned human intervention," and that wildness "can persist in environments that have been altered . . . as long as we refrain from interfering with nature's autonomous response." 022585. At least one team member suggested that they avoid shooting barred owls in wilderness areas, 017071 ("Do not treat within wilderness areas"). Both Defendants' failure to explain why the Program was consistent with the Wilderness Act and their ultimate Decisions authorizing the Program in wilderness areas were arbitrary and violated the Wilderness Act.

### D. Friends of Animals has standing.

Friends of Animals' standing has not been challenged in this case. Nonetheless, it is the plaintiff's burden to establish that: (1) it has suffered an "injury in fact;" (2) the injury is fairly traceable to the challenged action of the defendants; and (3) it is likely that a favorable judicial decision will prevent or redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An organization can assert "representational standing" to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Declarations from Friends of Animals' members demonstrate that Friends of Animals has standing as FWS's Decision will cause them injury, and a favorable judicial decision will likely redress this injury and prevent future injury. *See* attached Declarations of Marily Woodhouse, Stephen Coates, Brooks Fahy, and Avram Hiller. Furthermore, the participation of the individual members is not required because Plaintiff seeks declaratory and injunctive relief and the interests at stake are germane to Friends of Animals' purpose. *See Friends of Animals,* 879 F.3d at 1003 n.2 (holding Friends of Animals has standing to challenge scientific collection permit authorizing the take of barred owls). Friends of Animals can fully brief this issue at the Court's request or if Defendants contest standing.

## CONCLUSION

Defendants violated the APA, MBTA, NEPA, and the Wilderness Act in issuing their Decisions. These violations warrant vacating the Decisions and the MBTA Permit and enjoining Defendants from any further implementation of the Program.

Dated: February 18, 2026

Respectfully submitted,

*/s/ Jennifer Best*
JENNIFER BEST (*pro hac vice*)
STEPHEN HERNICK (*pro hac vice*)
Friends of Animals, Wildlife Law Program
6041 S. Syracuse Way, Suite 250
Greenwood Village, CO 80111
(720) 945-9453
jennifer@friendsofanimals.org
shernick@friendsofanimals.org

DAVID A. BAHR
Bahr Law Offices, P.C.
1035 ½ Monroe Street
Eugene, Oregon 97402
(541) 556-6439
davebahr@mindspring.com

*Counsel for Plaintiff*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

This brief complies with the applicable word-count set forth in the Court's November 26, 2025 Scheduling Order because it contains 11,999 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated: February 18, 2026

Respectfully submitted,

*/s/ Jennifer Best*
JENNIFER BEST (*pro hac vice*)