Kate Chupka Schultz, OR No. 221174
The Center for a Humane Economy
P.O. Box 30845
Bethesda, MD 20824
(858) 342-0398
kate@centerforahumaneeconomy.org

Claire Loebs Davis, WA No. 39812**
Animal & Earth Advocates, PLLC
20520 105th Ave. SW
Vashon, WA 98070
(206) 601-8476
claire@animalearthlaw.com

Jessica L. Blome*, CA No. 314898
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Admitted *pro hac vice*
**\*Pro hac vice* pending

*Attorneys for Plaintiffs Animal Wellness
Action and the Center for a Humane Economy*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| FRIENDS OF ANIMALS,<br>　　　　Plaintiff, | Lead Case No.: 3:24-cv-01928-AN<br>Consolidated Case No.: 3:25-cv-01739-AN |
| ANIMAL WELLNESS ACTION and THE<br>CENTER FOR A HUMANE ECONOMY,<br>　　　　Consolidated Plaintiffs,<br>v. | |
| BRIDGET FAHEY, in her official capacity as<br>the Acting Regional Director of the Fish and<br>Wildlife Service; et al.,<br>　　　　Defendants,<br>v. | **ANIMAL WELLNESS ACTION AND<br>THE CENTER FOR A HUMANE<br>ECONOMY'S MOTION FOR<br>SUMMARY JUDGMENT**<br><br>Request for Oral Argument |
| U.S. FISH AND WILDLIFE SERVICE, et. al.<br>　　　　Consolidated Defendants,<br>v. | |
| ENVIRONMENTAL PROTECTION<br>CENTER, et al.,<br>　　　　Defendant-Intervenors. | |

AWA and the Center's
Mot. for Summary Judgment　　　　　i

# TABLE OF CONTENTS

ACRONYMS AND SHORT CITATIONS.................................................................................. vi

MOTION FOR SUMMARY JUDGMENT................................................................................ 1

MEMORANDUM IN SUPPORT OF MOTION ....................................................................... 1

I.    FACTUAL BACKGROUND ............................................................................................ 2

    A.  Project Authorizes Barred Owl Killing Over Vast Region for 30 Years................... 2

    B.  AWA and the Center File Challenge to Project............................................................ 4

II.   ARGUMENT ...................................................................................................................... 4

    A.  Case is Governed by the APA, NEPA, and the MBTA ................................................ 4

    B.  AWA and the Center Have Demonstrated Standing and Exhaustion ....................... 5

    C.  FWS Failed to Consider a Reasonable Range of Alternatives Under NEPA............ 6

        *1.  Project's Purpose is to Manage Barred Owls to Increase Spotted Owl Populations* .. 7

        *2.  FWS Excluded Consideration of Reasonable Alternatives and Limited Itself to Alternatives That Could Not Accomplish Its Purpose* ................................................... 7

    D.  The Final EIS and ROD Are Insufficient under  NEPA and Arbitrary and Capricious under the APA.................................................................................................. 14

    E.  The Plan Lacks the Detail and Specificity that NEPA Requires ............................. 16

    F.  FWS Failed to Take a "Hard Look" at Impacts of the Program on Wildlife ......... 18

        *1.  FWS Failed to Thoroughly Consider Impacts to Spotted Owls* ................................ 19

        *2.  FWS Failed to Adequately Evaluate Impacts to Marbled Murrelets* ......................... 22

    G.  FWS Engaged in Unlawful Rulemaking by Creating a New Type of MBTA Permit without Providing Notice and the Opportunity to Comment................................... 24

        *1.  APA Requires Substantive Rules to Undergo Notice-and Comment Rulemaking* ..... 24

        *2.  At the Time of the Program's Development, No Existing MBTA Permit Authorized the Program's Activities* ................................................................................................. 25

        *3.  FWS Initally Planned to Promulgate a Rule Creating a New Permit Type* ............... 25

    4.   *FWS Arbitrarily Decided To Skip Required Rulemaking Process* .............................. 26

    5.   *New Permit Type Constituted a Rule Requiring Notice and Comment Rulemaking* . 28

**H.  By Issuing the Permit, FWS Exceeded the Authority Granted under the MBTA and Violated Section 706(2)(C) of the APA** .................................................................. **29**

**I.  FWS Violated Its Own Regulations in Issuing the Permit** ....................................... **30**

**III.  CONCLUSION** ......................................................................................................... 31

# TABLE OF AUTHORITIES

**CASES**

*Alaska Conservation. Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995 (D. Alaska 2020) ................................................................................................................................. 17

*Anderson v. Butz*, 550 F.2d 459 (9th Cir. 1977) ................................................................ 25

*Atchison v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) ................................................... 28

*Buschmann v. Schweiker*, 676 F.2d 352 (9th Cir. 1982)................................................... 24

*California v. Block*, 690 F.2d 753 (9th Cir. 1982)............................................................ 16

*Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051 (9th Cir. 1985)....................... 14

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................ 4

*City of Angoon v. Hodel,* 803 F.2d 1016 (9th Cir.1986).................................................... 11

*City of Carmel-by-the-Sea v. U.S. Dep't of Transportation*, 123 F.3d 1142 (9th Cir. 1997) ................................................................................................................................... 6

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004)................................................ 4

*Coal. for Canyon Pres. v. Bowers*, 632 F.2d 774 (9th Cir. 1980) .................................... 16

*Confederated Tribes & Bands of Yakima Indian Nation v. F.E.R.C.*, 746 F.2d 466 (9th Cir. 1984)........................................................................................................................ 30

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010)...... 14

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000) ................. 5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...... 5

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006) ................................. 16

*Linoz v. Heckler*, 800 F.2d 871 (9th Cir. 1986) ............................................................... 24

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ..................................... 4, 30

*Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810 (9th Cir. 1987)..... 14

*Missouri v. Holland*, 252 U.S. 416 (1920)........................................................................ 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..... 4, 16

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)................... 18

*Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010)...................... 6

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) ....... 19

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668 (9th Cir. 2007)............. 28

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).............................. 18

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ....................................................... 30

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007)............................................. 5

*Smiley v. Citibank (S.D.),* 517 U.S. 735 (1996) ....................................................... 24

*Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974)......................................... 16

*United States v. Nixon*, 418 U.S. 683 (1974) ......................................................... 30

*University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013)........... 30

*WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148 (9th Cir. 2015).................. 5

*WildEarth Guardians v. United States Dep't of Agric.*, 135 F.4th 717 (9th Cir. 2025).... 17

**STATUTES**

16 U.S.C. § 703................................................................................. 1, 4, 25

16 U.S.C. § 704................................................................................. 25, 30, 31

42 U.S.C. § 4321................................................................................. 1

42 U.S.C. § 4332(C) ............................................................................ 4

42 U.S.C. § 4336a(d) .......................................................................... 6

5 U.S.C. § 552(a)(1)(D) ....................................................................... 24

5 U.S.C. § 553................................................................................... 24, 25

5 U.S.C. § 701................................................................................... 1

5 U.S.C. § 706(2) ............................................................................... 3, 31

**REGULATIONS**

50 C.F.R. § 13.21.............................................................................. 5, 24, 25. 32

50 C.F.R. § 21.100............................................................................. 29

50 C.F.R. § 21.120 ........................................................................................ 29

50 C.F.R. § 21.123 ........................................................................................ 29

50 C.F.R. § 21.13 .......................................................................................... 30

50 C.F.R. § 21.150 ........................................................................................ 30

50 C.F.R. § 21.153 ........................................................................................ 30

50 C.F.R. § 21.174 ........................................................................................ 30

50 C.F.R. § 21.177 ........................................................................................ 30

50 C.F.R. § 21.2 ............................................................................................ 25

50 C.F.R. § 21.63 .......................................................................................... 25

50 C.F.R. § 21.95 .......................................................................................... 26

## ACRONYMS AND SHORT CITATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| AWA | Plaintiff Animal Wellness Action |
| BiOp | August 2024 Biological Opinion for the Barred Owl Management Strategy |
| BLM | Bureau of Land Management |
| Center | Plaintiff Center for a Humane Economy |
| Draft EIS | November 2023 Draft EIS for the Barred Owl Management Strategy |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| Final EIS | June 2024 Final EIS for the Barred Owl Management Strategy |
| FMAs | Focal Management Areas |
| FWS | U.S. Fish and Wildlife Service |
| GMAs | General Management Areas |
| MBTA | Migratory Bird Treaty Act |
| NEPA | National Environmental Policy Act |
| ROD | August 22, 2024 Record of Decision for Final Barred Owl Management Strategy Implementation and Issuance of a Migratory Bird Treaty Act Special Purpose Permit in Washington, Oregon, and California. |
| USGS | U.S. Geological Survey |
| Permit | MBTA Special Purpose Permit Issued under the 2024 Barred Owl Management Strategy |
| Program | 2024 Barred Owl Management Strategy |

AWA and the Center's
Mot. for Summary Judgment                    vii

## MOTION FOR SUMMARY JUDGMENT

For the reasons set forth below and in the concurrently filed brief by Plaintiff Friends of Animals ("Friends of Animals Motion"), Plaintiffs Animal Wellness Action ("AWA") and the Center for a Humane Economy ("Center") hereby move for summary judgment against Defendants U.S. Fish and Wildlife Service ("FWS"), FWS Director Brian Nesvik, the U.S. Department of the Interior, and Secretary of the Interior Doug Burgum, for violations of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), and the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.* ("MBTA"), in the development and finalization of the 2024 Barred Owl Management Strategy (the "Program"), the Program's Final Environmental Impact Statement ("Final EIS"), and the issuance of a MBTA Special Purpose Permit ("Permit").[1]

## MEMORANDUM IN SUPPORT OF MOTION

The Program authorizes the mass killing of up to 450,000 barred owls in the Pacific Northwest and California over the next 30 years. FWS contends that this unprecedented sacrifice of barred owls will facilitate the survival of their less-adaptable cousin, the spotted owl: an iconic species facing alarming decline. If that were true, the Program would raise difficult questions about the ethics—and the wisdom—of trying to pick ecological winners and losers during a time of unpredictable global environmental upheaval.

But these are not the questions the Court faces here, because the Program does not offer a realistic plan to save the spotted owl, or even to slow the species' decline. Although it calls itself a "strategy," in reality, the Program is a shot in the dark, with potential adverse impacts on spotted owls and other species that FWS fails meaningfully evaluate. Instead of describing a scientifically grounded conservation intervention with specific actions, measurable outcomes, and a clear pathway for success, the Program opens the door for the haphazard killing of barred owls, in

---

[1] Counsel for AWA and the Center certify that the parties have conferred as required by Local Rule 7-1 and have been unable to resolve their dispute.

AWA and the Center's
Mot. for Summary Judgement                    1

unpredictable but potentially immense numbers, at unspecified locations within a vast range, at an unknown pace and frequency, for an indeterminate period lasting up to 30 years. FWS provides no evidence to support its claim that such a course of action will contribute to either the survival or the recovery of the spotted owl; to the contrary, the Program lacks the elements that experts acknowledge are essential to achieving that goal.

AWA and the Center value both barred owls and spotted owls, and deeply regret that humans have driven spotted owls to the brink with the continued destruction of the old-growth forests on which they depend. However, this poorly considered action will not cure those past sins. To the contrary, it may actually accelerate the destruction of spotted owls' habitat, speeding their decline while pointlessly killing hundreds of thousands of members of another protected species. The Program thus presents a textbook case of arbitrary and capricious agency action, adopted without the planning, strategy, or analysis that NEPA demands.

## I.    FACTUAL BACKGROUND

AWA and the Center incorporate the factual background from the Friends of Animals Motion, with the following additions.

### A.  Project Authorizes Barred Owl Killing Over Vast Region for 30 Years

The Final EIS analyzed six alternatives, including a "no action" alternative and five alternatives that prioritized killing barred owls at different intensities within different regions and with different areas of focus. AR 408-411; 452. The Final EIS considered but declined to perform a detailed analysis of another ten alternatives, including options that would have further limited the scope of barred owl removal, focused on nonlethal control measures and reproductive interference, or incorporated habitat protection measures. AR 452-58.

On August 9, 2024, FWS published the Record of Decision ("ROD"), which elected to proceed with Alternative 2, the preferred alternative. AR 15. Under this alternative, permitted entities and individuals are allowed to shoot barred owls across twelve different "provinces" extending along the west coast from the Canada border to San Francisco. AR 68 (map). The

AWA and the Center's
Mot. for Summary Judgement                    2

Program does not specify where barred owl management must, may, or will take place within this vast region; those decisions are left to permittees and landowners and managers. AR 69-70. Rather, the different management areas outlined by the Program are only suggestions to "provide focus and recommendations to implementing entities." AR 69. For that purpose, the Program designates General Management Areas ("GMAs"), large, mapped areas intended to be the "primary focus of management in most provinces." AR 73. Within those GMAs, other entities may create Focal Management Areas ("FMAs") to coordinate their activity, based on their "local knowledge, interests" and goals. AR 79.

One of the Program's few limitations is that FMAs under active management may not exceed 50% of the GMA areas in any province at any given time. AR 75. However, this restriction does little to limit simultaneous actions under the Program, because it only applies to management in FMAs that are within GMAs—the Program puts no limit on management activities within GMAs but outside FMAs, or outside GMAs. AR 29.

The Program also does not specify any minimum levels of barred owl control—either total, within each province or GMA, or by each permittee. Participation is entirely voluntary, and each participant decides to what extent and for how long they want to conduct removal activities. AR 65.

The Program allows for the killing of both barred owls and barred owl-spotted owl hybrids, at any time of the year, often at night. AR 622, 624; *see also* 724. The Program guidelines "recommend, but do not require" certain practices to try to limit the number of dependent young left behind to starve after their parents are killed. AR 625. For each group or person participating in the Program, someone must be designated as an "implementer," and every person involved in killing barred owls must fulfill certain requirements to be certified as a "removal specialist." AR 623-24. Removal specialists will lure barred owls to them using recorded owl calls. AR 626. At least one removal specialist must positively identify barred owls before they shoot them, using auditory or visual cues. AR 625. Removal specialists use shotguns to kill owls, except when unsafe to do so, in which case they can trap and "euthanize" them. AR 627-28.

AWA and the Center's
Mot. for Summary Judgement                3

### B. AWA and the Center File Challenge to Project

On October 31, 2024, AWA and the Center filed a complaint challenging the Program in the Western District of Washington. *See* Dkt. 1 of Consolidated Case No. 3:25-cv-01739-AN ("Consolidated Case"). AWA and the Center amended their complaint on August 14, 2025. Consolidated Case Dkt. 35 (amended complaint); Dkt. 42 (errata). On October 23, 2025, the Court granted Plaintiffs' motion to transfer the matter to the District of Oregon for the purposes of consolidation with the related case *Friends of Animals v. Morrison*, No. 3:24-cv-01928-AN. Consolidated Case Dkt. 52. The Court consolidated the cases on October 28, 2025. Dkt. 44.

## II.    ARGUMENT

### A. Case is Governed by the APA, NEPA, and the MBTA

This case is governed by the APA, which courts use to review compliance with NEPA and the MBTA. *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1203-04 (9th Cir. 2004).

Under the APA, courts must declare agency action unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Although courts may not "substitute [their] judgment for that of the agency," they must undertake "a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971); *see also Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024) (judges must determine questions of law or statutory construction, and may not defer them to agencies). An agency may exercise discretion within its expertise, but it must "articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

AWA and the Center's
Mot. for Summary Judgement                    4

NEPA requires agencies to take a "hard look" at the environmental consequences of their actions by preparing an EIS for each "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007). An EIS must evaluate "a reasonable range of alternatives" that will meet a project's goals and include detailed statements on the "reasonably foreseeable environmental effects" of the proposed action. 42 USCS § 4332(C).

The MBTA is the Congressional implementation of four international treaties between the United States and Canada, Mexico, Japan, and Russia to protect shared migratory bird populations. *See* 16 U.S.C. § 703(a). It provides that "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture or kill" migratory birds. *Id.*

Regulations governing the issuance of permits prohibit FWS from permitting a requested action if it "potentially threatens a wildlife or plant population" or if the applicant fails to show a "valid justification" for the take. 50 C.F.R. § 13.21(b).

**B.  AWA and the Center Have Demonstrated Standing and Exhaustion**

An organization may sue on behalf of its members if those members have standing in their own right and the interests they assert are germane to the organization's purpose. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). "Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, the causation and redressability requirements are relaxed." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).

AWA and the Center have standing to sue on behalf of their members because those members assert cognizable aesthetic interests at the heart of both organizations' missions to protect

animals and their welfare, including wildlife and birds. AR 6753. The Program's implementation threatens imminent harm to the aesthetic, spiritual, and recreational interests of AWA and the Center's members and supporters. *See, e.g.*, Declaration of Jonathan Paul ¶¶ 12-24 (expressing concern over the Program's impacts to his aesthetic and spiritual interests in observing and experiencing wildlife, including owls, as well as the potential safety risks it will cause); Declaration of Alexandra Paul ¶¶ 9-11, 18-19 (expressing concern about the Program's impacts to the natural world and quality of the wilderness on which she relies on for recreation and aesthetic appreciation); Declaration of Tamara Drake ¶¶ 11, 16-18 (discussing how the Program will impact on her ability to view and hear owls on her property and impacts to other wildlife).

AWA and the Center exhausted their administrative remedies by submitting comments on the Program. *See* AR 6753-61.

## C. FWS Failed to Consider a Reasonable Range of Alternatives Under NEPA

The starting point for an agency's NEPA analysis is its summary of the "underlying purpose and need for the proposed agency action." *See* U.S.C. § 4336a(d) (requiring a statement of purpose and need for environmental documents prepared under NEPA). The purpose and need statement sets the parameters for an EIS by defining the range of alternatives an agency may, and must, consider. *See City of Carmel-by-the-Sea v. U.S. Dep't of Transportation*, 123 F.3d 1142, 1155 (9th Cir. 1997) ("The stated goal of a project necessarily dictates the range of 'reasonable' alternatives[.]").

Courts afford agencies broad deference in defining a project's purpose and need, as long as they do not use unreasonably narrow terms. *City of Carmel-by-the-Sea*, 123 F.3d at 1155 (internal citation omitted). A statement of purpose and need is unreasonably narrow if "only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become foreordained formality." *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010).

AWA and the Center's
Mot. for Summary Judgement                 6

1. *Project's Purpose is to Manage Barred Owls to Increase Spotted Owl Populations*

The Final EIS stipulates that the purpose of the proposed action is to "reduce barred owl populations to *improve the survival and recovery* of northern spotted owls and *to prevent declines in California spotted owls* from barred owl competition." AR 406 (emphasis added). Relative to the northern spotted owl, the EIS further indicates that the action's purpose is to "reduce barred owl populations within selected treatment areas in the short term and *increase northern spotted owl populations* in those treatment areas." *Id.* (emphasis added).

The Program bases its statement of purpose and need on one of the 33 recovery actions in the 2011 Revised Recovery Plan for the Northern Spotted Owl ("2011 Recovery Plan"). These recovery actions are a suite of recommended steps designed to address the primary threats facing spotted owls, including the past and current destruction, modification, and curtailment of habitat; disease and predation; the inadequacy of regulatory protections; and the competition posed by barred owls. AR 68237, 68255, 68324-28. Implemented together, they are designed to accomplish the Recovery Criteria: four "measurable, achievable" goals to bring about the recovery of the spotted owl. AR 68241. The first benchmark, Recovery Criterion 1, seeks to establish a "stable population trend" for spotted owls so that "the overall population trend of spotted owls through the range is stable or increasing over 10 years." AR 68255. The Program focuses on Recovery Action 30: "Manage to reduce the negative effects of barred owls on spotted owls so that Recovery Criterion 1 can be met." *See* AR 407 (Final EIS); 68317 (2011 Recovery Plan).

2. *FWS Excluded Consideration of Reasonable Alternatives and Limited Itself to Alternatives That Could Not Accomplish Its Purpose*

FWS narrowly interpreted its statement of purpose and need to require it to consider only those action alternatives that provided exclusively for killing barred owls. AR 408-411. Although the five action alternatives in the Final EIS describe different approaches and levels of intensity for killing barred owls, in reality, there is little to separate them, because those approaches are no more than recommendations. *Id.; see* AR 693 (FWS rejecting further adjustments as unnecessary

AWA and the Center's
Mot. for Summary Judgement                    7

in response to comments, because the selected alternative merely "allows for, but does not require" implementation of its strategy). As a result, FWS created its own Catch-22: on one hand, none of the alternatives it considered were reasonable, because they were all inadequate to achieve the Program's end goals; on the other, FWS had interpreted the project's purpose so narrowly that it precluded itself from considering reasonable alternatives that might have been sufficient to meet those goals.

a.   <u>Data Shows Barred Owl Removal Will Not Increase Spotted Owl Populations</u>

Part of the Program's purpose is to execute Recovery Action 30, which calls on the service to "implement the results" of research performed through Recovery Action 29, which directs the agency to conduct studies on barred owl control. AR 68317. FWS implemented Recovery Action 29 in 2013, when it began a controlled experiment to kill roughly 2,500 barred owls throughout five study areas: Green Diamond and Hoopa Willow Creek in California, the Coast Ranges and Union/Myrtle (Klamath) in Oregon, and Cle Elum in Washington (the "Experiment"). AR 52; *see* Friends of Animals' Mot. 7-10 (describing studies).

However, the Experiment did not show that barred owl removal would achieve the Program's goal of increasing spotted owl populations. When evaluated as a group, the studies suggested that barred owl removal *mitigated* the decline of spotted owls, with an estimated mean annual population decline of 12.1% in control areas without removal, compared to a 0.2% decline in areas where barred owls were killed. AR 8363. FWS thus characterizes the studies as showing a "strong, positive" effect on the survival of northern spotted owls. AR 487. However, for three of the five study areas, the confidence interval for the estimated survival rate encompassed the possibility that there had been no change in spotted owl survival due to barred owl removal. AR 21823. And in four out of the five study areas, spotted owl populations continued to decline, even after 3-6 years of removal actions. *See* AR 8367 (meta-analysis describing study results); *see also* AR 21834 (PowerPoint estimating removal impact in each study). The Experiment also showed a statistically insignificant impact on the recruitment of spotted owls in areas where barred owls were killed. AR 21831.

AWA and the Center's
Mot. for Summary Judgement                              8

Green Diamond was the only study area to show an increase in spotted owl populations following barred owl removals, with treated areas showing a slight 2.9% population growth. AR 31889. However, the study's authors were clear that this result was likely an outlier, because the proportion of barred owls to spotted owls in the Green Diamond study area was among the lowest of all the spotted owl territories with a barred owl presence in Washington, Oregon, or California. AR 31890. As a result, researchers were able to effectively remove barred owls throughout the treatment area, continuously killing all new barred owls over the three-year span of the study. *Id*. That was sufficient to produce an apparent increase in spotted owl survival rates in treatment areas, but even under these ideal conditions, there was only a "slight recovery from the decline in spotted owl occupancy," because the study saw no increase in spotted owl colonization. AR 31891. Researchers concluded the results would be much more modest in most areas of spotted owl habitat, "where barred owls have been present in large numbers for a longer period of time and the population of spotted owls has been more suppressed." AR 31892; *see* AR 488 (Green Diamond area conditions unlike those in most of the northern spotted owl range).

In all other study areas, spotted owl populations continued to decline even after sustained and continual barred owl removal. *See* Friends of Animals Mot. Figure 1; AR 21819 (same). Those results are consistent with another analysis that predicts barred owl removal is likely to have only modest conservation impacts: at best, temporarily slowing the decline of spotted owls, but falling far short of putting them on the path toward recovery. For example, an analysis by the Bureau of Land Management ("BLM") predicts that barred owl removal would not appreciably reduce the probability of northern spotted owl populations declining to 250 females within 50 years in three modeling regions, while in three others it would drop that likelihood from 17% to 11%. BLM_AR-3486. Similarly, BLM estimates that barred owl control would modestly delay the likely *de facto* extirpation of northern spotted owl populations in two modeling regions, postponing the date on which the likelihood of extirpation exceeded 50% from 39 to 45 years and 20 to 18 years, respectively.

AWA and the Center's
Mot. for Summary Judgement                    9

b. <u>Barred Owl Removal Must be Targeted, Consistent, and Continuous to Generate Even Modest Conservation Benefit</u>

To realize even these modest conservation benefits, there is a broad consensus that any effective barred owl removal program must contain the key elements of commitment, consistency, and continuity. As FWS often emphasizes, the barred owl population is numerous and widespread. This means that new barred owls will rapidly recolonize areas left open by removals, with FWS estimating that they would quickly return to roughly 60% of the cleared areas. AR 1895. Researchers have confirmed that "recolonization by barred owls from unmanaged areas is rapid and recolonization by spotted owls is slow," meaning that management efforts require "the removal of many individuals over multiple years to achieve even modest ecological benefits." AR 11576 (Hofstadter et al. (2022)). This means the effective control of barred owl populations would require "forever management" (AR 12021)—or, in other words, a grim commitment to an endless cycle of killing.

Indeed, if removal efforts pause, any conservation gains for spotted owls will likely be immediately reversed. *See* AR 39447 ("If removals stop at Hoopa, the spotted owl population should continue to be monitored to document what will likely be a rapid decline as barred owls will recolonize very rapidly."). As one researcher put it: "Even with a large, sustained effort to lead the Barred Owls into extinction in a region, it would likely be undone by individuals immigrating from a virtually unending reservoir of Barred Owls[.]" AR 27708. FWS concedes there is no data to suggest this cycle will ever end. AR 12741. It thus acknowledges that "[b]arred owl management is most effective when continued for an extended time period," with isolated efforts at removal unlikely to lead to any conservation benefits. AR 66.

c. <u>None of the Action Alternatives Offered a Pathway to Achieve Project Goals</u>

All the alternatives that FWS considered are built around the same incorrect presumption: that barred owl control alone will be sufficient to achieve the Program's goals of increasing spotted owl populations. Indeed, they are highly unlikely to realize even the modest conservation goals of

AWA and the Center's
Mot. for Summary Judgement                    10

the studies in the experiment, because none provide any reasonable expectation of consistency or continuity.

All alternatives describe an entirely voluntary process, which merely provides the option for federal, state, and Tribal entities, private companies, and individuals to participate in removal. AR 425; *see* AR 65 ("The [Program] does not create any specific requirements for proactive actions[.]"). For each alternative, removal would only take place on the land of willing landowners or land managers, including federal, state, Tribal, and local government entities. *Id.* The alternatives differed as to their recommendations for the scope and focus of removal, but all left that ultimate decision up to each participating individual or entity. None of the alternatives included dedicated resources or funding sources. And no required participating individuals or entities to commit to removal efforts for any particular period of time. *See* AR 66 ("[W]e recommend, but do not require, that anyone implementing barred owl removal do so with the intent to continue the effort for at least five years."). In short, for all the options, "[r]emoval would occur sporadically across a large landscape." AR 728.

It was unreasonable for FWS to focus its analysis solely on voluntary programs that would lead to sporadic and unpredictable results, based on a strategy that had no track record of achieving the agency's goals. Although the alternatives the agency considered would no doubt lead to the death of many barred owls, that is not an end unto itself, and none showed a potential pathway toward the project's ultimate goal of increasing spotted owl populations. As a result, the Final EIS was inadequate under NEPA and arbitrary and capricious under the APA, because there was no rational connection between the selected alternatives and the stated purpose and need. *See City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").

d.   FWS Refused to Consider Reasonable Alternatives to Achieve Project Goals

As the Experiment demonstrated, even aggressive, consistent, and continuous barred owl removal is unlikely to lead to increases in spotted owl populations. As a result, there is broad

AWA and the Center's
Mot. for Summary Judgement                11

consensus that barred owl removal is unlikely to be effective unless paired with proactive measures to protect and restore spotted owl habitat. That is the position of the 2011 Management Plan. AR 68238 (efforts to manage barred owls "must be conducted simultaneously" with "[a]addressing the threats associated with past and current habitat loss"). The leading scientists who study the impact of barred owls on the spotted owl population agree. AR 34334 (Franklin et. al. (2021)) ("Our analyses indicated that northern spotted owl populations potentially face extirpation if the negative effects of barred owls are not ameliorated while maintaining northern spotted owl habitat across their range."); 75408 ("in most study areas, habitat effects on expected Northern Spotted Owl territorial occupancy are actually greater than the effects of competition from Barred Owls.").

Other agencies reached the same conclusion. In the Final EIS for its Land Management Plan, the BLM performed extensive analysis of the pressures facing spotted owl populations, concluding that the "greatest contribution to conservation and recovery of the northern spotted owl by the BLM would come from a combination of habitat management and participation in barred owl management." BLM _AR3486. Indeed, even FWS' Final EIS concedes this point. AR 417 ("'northern spotted owl populations potentially face extirpation if the negative effects of barred owls are not ameliorated *while maintaining northern spotted owl habitat across their range.*'") (citing Franklin et al. (2021)) (emphasis added); 407 (similar). Many public commenters urged FWS to pair its barred owl removal plan with effective habitat protections. *See, e.g.*, AR 6750 (Humane Society of the United States); 6756-006758 (AWA and the Center); 6581 (Sierra Club); 16051-57 (coalition of Audubon groups); 6610-11 (Vancouver Audubon).

Despite the broad consensus that barred owl control must be paired with effective habitat management, the Final EIS summarily rejected any alternatives that incorporated habitat projections. AR 456. Its logic for doing so is elusive. While the EIS conceded that the "presence of high-quality spotted owl habitat may assist individual spotted owls in remaining on a site," it seemed to conclude that efforts to protect or restore such habitat would be futile because "habitat management alone cannot prevent the eventual exclusion of spotted owls from these habitats." AR 457. Then it summarily asserted that the threat posed by habitat loss is "being addressed through

other processes," including federal land management plans, the 2011 Recovery Plan, and critical habitat designations. *Id.*

This is fantasy: the record makes clear the ongoing loss of spotted owl habitat is *not* "being addressed through other processes." *See id.* FWS has spent the past 20 years delaying the designation of critical spotted owl habitat and trying to reduce the amount of designated critical habitat. Friends of Animals Mot. 3. Meanwhile, federal and land management plans are clearly insufficient to address this threat. In the Project's Biological Opinion ("BiOp"), FWS estimates that during the first 25 years after the Northwest Forest Plan, about 24% of spotted owl nesting/roosting habitat (or 2.9 million acres) was destroyed, 70% of which was due to timber harvest. AR 1282. The rate of habitat loss increased between 2017 and 2023, with spotted owls losing 11.9% of their habitat during that time. *Id.* That rate is likely to accelerate even faster under the aggressive logging plan announced by the Trump administration. *See, e.g.,* Immediate Expansion of American Timber Production, Exec. Order No. 14,225, reprinted in 90 Fed. Reg. 11,365 (Mar. 6, 2025). Far from protecting habitat, the Program is likely to exacerbate that loss, because the implementation of a barred owl management plan will end the Bureau of Land Management's prohibition on the take of spotted owls, thus opening up new spotted owl habitat for potential logging. AR 560. Meanwhile, some timber companies participating in the killing of barred owls have already been rewarded with the ability to log in spotted owl habitat (AR 564), while FWS has indicated it is open to providing "incentives" to entice other logging companies to shoot owls (AR 4469-74).

In the end, FWS's logic for rejecting the inclusion of habitat protections was entirely circular: it could not include habitat protections in the project because it was focusing exclusively on alternatives for controlling barred owls. *See* AR 686, 729. This reasoning also ignores the full language of the statement of purpose and need, which ultimately aims at increasing spotted owl populations. Indeed, FWS often seems to lose track of this end goal in its singular focus on killing barred owls. In response to comments, it rejects the idea of "expanding the purpose and need of the proposed action to include improving the survival and recovery of northern spotted owls"—

AWA and the Center's
Mot. for Summary Judgement                    13

without acknowledging that it had already identified this as a central part of the Program's purpose. *Compare* AR 685 *to* 406. To justify the exclusion of habitat protections that could help achieve these goals, FWS simply reframes the Program's objectives: "The focus of the purpose and need is on the threat from barred owls." AR 86. But a careful reading of FWS' statement of purpose shows its recognition of the importance of pairing habitat protection with a removal program. *See* AR 64 ("'[N]orthern spotted owl populations potentially face extirpation if the negative effects of barred owls are not *ameliorated while maintaining northern spotted owl habitat across their range*.'") (quoting Franklin et. al (2021)) (emphasis added).

All five action alternatives considered under the Final EIS thus (1) focused on a strategy that the agency's best science showed was unlikely to result in increased spotted owl populations; (2) excluded any provisions for the protection or restoration of spotted owl habitat, which experts agreed was necessary to achieve meaningful conservation outcomes; and (3) incorporated limitations making it all but impossible for them to incorporate the consistency or continuity necessary to achieve even modest conservation goals.

This analysis of alternatives is "the heart of the environmental impact statement.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010). As a result, "the existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1057 (9th Cir. 1985). The Final EIS should be reversed and remanded because it focuses on unreasonable alternatives that will not achieve the agency's goals while failing to "consider every reasonable alternative" in a manner "sufficient to permit a reasoned choice." *Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810, 815 (9th Cir. 1987), *rev'd on other grounds sub nom. Robertson v. Methow Valley Citizens Council,* 490 U.S. 332  (1989).

### D. The Final EIS and ROD Are Insufficient under  NEPA and Arbitrary and Capricious under the APA

Without any substance to rely on, FWS focused on creating the illusion that the unsubstantiated, incomplete, and insufficient alternative it selected offered a reasonable path

toward achieving the agency's stated goal of increasing northern spotted owl populations. *See* AR 406. The agency's first challenge was to spin the data that demonstrated that barred owl removal was extremely unlikely to increase spotted owl populations.

The Final EIS acknowledged that the Experiment showed that barred owl removal had the potential to generate extremely small increases in spotted owl populations only in a "relatively small percentage of the northern spotted owl range," where barred owl densities were low, such as the Green Diamond study area. AR 487-88. It conceded that the Experiment showed that the population was likely to continue to decline throughout the vast majority of spotted owl habitat, even after the concentrated, coordinated, and continuous killing of barred owls. AR 488. From there, FWS began to take liberties with the data. After acknowledging that the Green Diamond study was an outlier, it misleadingly suggested that the rest of the studies showed that spotted owl population declined by a mean of -0.2% following barred owl removals. *Id.* Not so. The estimated 0.2% population drop was the mean across *all* study areas, *including Green Diamond*, the only area that saw even a slight increase in spotted owls. *See* AR 8367. Then the EIS takes another leap, unsupported by either data or logic, to assume that spotted owl populations would grow by an average of 0.5% in areas where the Projected allowed for barred owl removal. AR 488. Without reason or justification, the Final EIS thus deemed that a spotted owl population growth rate of 0.5% was a "reasonable rate of population change" to assume when evaluating the efficacy of project alternatives. *Id.*

If possible, the next set of assumptions on which FWS relies has even less basis in reality. With no data to suggest how broadly, consistently, or effectively entities or individuals would engage in barred owl removal, the agency posited that the Program would be implemented at 10% the first year, 50% the second year, and to the fullest capacity in each year thereafter. AR 472. It then speculated, without any support, that in each management area where removals took place, they would result in the removal of 90% of the barred owl population each year. *Id.*

Combining these unsupported expectations, FWS created an unrealistic picture of the Program's likely results, to make it appear that it would achieve the goal of increasing spotted owl

AWA and the Center's
Mot. for Summary Judgement                    15

populations. AR 495. Notably, even these exaggerated predictions resulted in modest numbers, forecasting that the Program would increase spotted owls by just 8% (or 278 pairs) over the space of 30 years. AR 495.

Such rampant speculation is incompatible with NEPA's requirement that an agency take a "hard look" at the potential consequences of its contemplated action. *See Sierra Club*, 510 F.3d at 1018. And by approving a project that showed no realistic prospect of meeting its articulated goals, FWS failed to make a "'rational connection between the facts found and the choice made.'" *See State Farm*, 463 U.S. at 43 (1983).

### E.  The Program Lacks the Detail and Specificity that NEPA Requires

"The touchstone for [a court's] inquiry is whether [the EIS process] fosters *informed* decision-making and *informed* public participation." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (emphases added). A proposed project requires sufficient specificity and detail for decision-making and for the public to be informed. *See, e.g.*, *Trout Unlimited v. Morton*, 509 F.2d 1276, 1282-83 (9th Cir. 1974); *Coal. for Canyon Pres. v. Bowers*, 632 F.2d 774, 781 (9th Cir. 1980). If an agency proposes a large-scale project that, due to its nature, leaves site- or time-specific details for later development, an agency must perform a separate NEPA review of each site-specific project before implementation. *See 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006). A project's large scope, breadth, and time frame do not excuse agencies from the requirement of specificity. *Id.* at 1096; *Block*, 690 F.2d at 765 ("NEPA contains no exemptions for projects of national scope.")

Broad programmatic plans are permissible under NEPA, so long as they are followed by more site-specific analyses. However, NEPA does not permit an agency to skip from a broad programmatic analysis to implementation without ever reviewing the site-specific environmental impacts.  If an agency proposes implementing a project without further NEPA review—as FWS did here—the agency must disclose sufficient details to allow for a meaningful analysis of the project's reasonably foreseeable impacts. *Se. Alaska Conservation. Council v. U.S. Forest Serv.*,

443 F. Supp. 3d 995, 1006 (D. Alaska 2020).

FWS failed to disclose any site-specific information about the Program, because none of it was known. Because the Program was to be entirely voluntary, FWS could not predict where project activities would take place, when, or to what extent, or perform any realistic analysis of how they would impact the ecosystem, wildlife, or people. This uncertainty, however, is no excuse for implementing a project without NEPA required analysis. An agency may not "rely upon forecasting difficulties or the task's magnitude to excuse the absence of a reasonably thorough site-specific analysis of the decision's environmental consequences." *Id.; see also WildEarth Guardians v. United States Dep't of Agric.*, 135 F.4th 717, 730 (9th Cir. 2025) (agency's state-wide analysis of predator management violated NEPA for insufficiently specific scale).

These uncertainties plagued every corner of the Final EIS. For example, in examining the impacts of removals on marbled murrelets, FWS stated that "[t]he potential degree of this impact at the marbled murrelet population level *depends on the area of removal activity* that overlaps the range of the murrelet." AR 000412 (emphasis added). It follows logically that the impact will also depend on when and how frequently removals occur. But neither FWS nor the public knows where, if, or when removals might be carried out in murrelet habitat, for the Program fails to specify its FMAs.

As another example, FWS was unable to fully consider the potential adverse impact of shotgun noises to wilderness and to people's recreational interests. AR 412-13 ("The extent, location, and intensity of these effects would vary by alternative, *depending on the area included* in barred owl management" (emphasis added)). This leaves open the possibility that in some areas, such as near major hiking or recreation sites, such impacts could be substantial. Had site-specific impacts been properly analyzed, appropriate mitigation efforts could have been considered.

This same uncertainty extended to FWS's consideration of economic impacts. As one forest management coalition demanded: "At minimum, the [Final EIS] must be explicit in the effects of the Barred Owl management strategy…[we are] unable to provide technical comments on the sufficiency of the [Draft EIS] because FWS has left the effect of the Barred Owl

AWA and the Center's
Mot. for Summary Judgement                    17

management strategy so ambiguous." AR 6649. Nevertheless, the Final EIS ended the analysis of impacts on timber harvest by concluding, "[w]hile we can project the likely number of these sites, we cannot identify their specific location. Thus, the analysis of socioeconomic effects is, by necessity, qualitative and descriptive." AR 556.

FWS also sidestepped fears that the Program would lead to increased logging. *See, e.g.*, 6780 (Cascadia Wildlands noting that BLM could use Program to "justify further degradation and outright removal of spotted owl habitat is unconscionable"); 6676 (Whatcom County Wildlife Advisory Committee members noting Program may allow for more logging as spotted owl populations rebound and federal agencies have more "flexibility," in FWS' words, in timber harvest expansion); 6581 (Sierra Club expressing same). FWS only speculated on the "indirect effect" of possibly increased spotted owl populations on timber harvest. AR 413-14; *see also* AR 702 ("If spotted owl populations rebound, each adverse effect to an individual spotted owl will become less consequential to the likelihood of survival and recovery at the range-wide scale, potentially providing greater flexibility to action agencies in conducting forest management.").

NEPA demands more. If an agency cannot describe what a project will do, then it cannot fulfill NEPA's two primary functions: it cannot "carefully consider" the potential environmental impacts of a proposed action, nor can it provide sufficient "relevant information" to the public to allow for meaningful participation in the process. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. at 349.

### F. FWS Failed to Take a "Hard Look" at Impacts of the Program on Wildlife

To start, an agency cannot take a "hard look" at the impacts of a project without details about what that project proposes. Courts "employ an arbitrary and capricious standard…to determine whether the agency has taken a 'hard look' at the consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why a project's impacts are insignificant.'" *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). A "hard look" should include a "[r]easonably

AWA and the Center's
Mot. for Summary Judgement                18

thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380.

### 1. *FWS Failed to Thoroughly Consider Impacts to Spotted Owls*

A significant risk of the Program is accidentally killing spotted owls during barred owl removals. This is a threat not only because removals would most often occur at night, *e.g.* AR 630, but also because barred and spotted owls are increasingly resembling one another in the west, *e.g.* AR 630-31, 79714, and because the existence of hybrid owls from interbreeding further complicates proper identification.

Many commentators identified the risk of possible spotted owl take. *See, e.g.*, AR 6601 (North Central Washington Audubon Society); 6759 (Center and AWA ); 6517 ("Because spotted owls occasionally respond to barred owl calls and sometimes socialize and breed with barred owls, accidentally killing a spotted owl is an uncommon but significant risk of using shotguns to remove barred owls from spotted owl habitat."); 6578 (echoing concerns from the Environmental Protection Agency ("EPA") and citing study that showed around a 41% error rate in visual identification of hybrids); 6700 (Bird Conservation Oregon). The EPA's comments emphasized serious concerns about possible spotted owl deaths, noting that "visual identifications of hybrids in the field were often inaccurate," and cited Funk et al. (2007), which proved that of 12 owls identified as hybrids visually in the field, 5 were genotyped as pure barred (3) or pure spotted (2). AR 7679-7680.[2]

In the Final EIS, FWS added an additional requirement for removals when hybridity is suspected. When a hybrid is to be removed, both visual and auditory methods of identification are

---

[2] It is not even known how prevalent spotted/barred hybridity is. AR 4159 (in e-mail to FWS from expert, "Unfortunately we don't have consistent data [on hybrid prevalence] from the [removal] study areas. There were some papers published 20-25 years ago on this, but not anything recent to my knowledge.").

required, and two individuals must be present. AR 630-31. However, even with auditory and visual methods and two individuals present, this does not prevent the possibility of mistaken take of a spotted owl because evidence shows that both visual and auditory detection methods are highly susceptible to error. *See, e.g.*, AR 7679-80 (EPA comments on Draft EIS); 34564-71 (the aforementioned Funk. et al. (2007) study); 1112-14 (BiOp explaining how spotted owl calls can be "consistently" different from standard).

However, when hybridity is not suspected, owls may be removed after *only* visual *or* auditory identification. AR 625. This is even though FWS' own BiOp warns that "that barred owls in the West may exhibit muted visual characteristics such as the extent of barring on the front chest"—which is *the* primary way in which to visually distinguish barred from spotted owls. AR 1112. The BiOp further warns that "it is critical to realize that individual spotted owls do not always use the complete standard four-note hoot," they "have been known to consistently" change their standard call, and parts of the call can attenuate over distance and so morph in sound. AR 1115.

FWS struggled with the lack of published literature on the identification of hybrids. *See* AR 3818. However, the literature that *does* exist suggests that western barred owls may be naturally evolving to even more closely resemble their spotted counterparts. *See generally* AR 79713-18 (biologists noted around 2018 that recently collected barred owl specimens "display[ed] striking morphological variation," finding after genetic testing that "oddly plumaged" western barred owls were *not* hybrids). In other words, even "pure" (non-hybrid) barred owls are looking more and more like spotted owls in the areas covered by the Program. The EPA noted this, too, as a reason for serious concern over the possibility of accidental spotted owl death. AR 7680. However, FWS wholly failed to consider the increasing likelihood that barred owls (and indeed hybrids) will increasingly come to resemble spotted owls.

FWS briefly addressed the risk of inadvertent spotted owl deaths in its removal protocol, stating that "[i]f there is any question as to whether the bird may be a spotted owl, no removal shall occur." AR 631. But FWS failed to consider the possibility that a hybrid or spotted owl's call will

AWA and the Center's
Mot. for Summary Judgement                20

sound like a barred owl, this assumption will not be questioned, and because removal can occur only through audio identification, the spotted owl will be killed. FWS here failed to take the required "hard look" at the impact of "consistent" atypical songs on the likelihood of mistaken lethal take of spotted owls.

According to a U.S. Geological Survey ("USGS") report summarizing the results of the first 21 months of FWS' Barred Owl Removal Experiment in three of the four study areas, even removal specialists that were supervised by the USGS, certified by the USGS, and approved by the Institutional Animal Care and Use Committee at Oregon State University, had a 4.5% rate of non-lethal shots requiring subsequent non-firearm euthanasia. AR 75199. There was also an additional 2.5% (16 cases) rate of non-lethal shots that required a second lethal shot to the injured owl to kill it. *Id.* In other words, even in FWS' own Removal Experiment, with federally supervised and certified and institutionally approved removers, there was about a 7%—or about 1 in every 15 owls—flawed removal rate.

The fact that even under ideal scenarios removals had a 7% error rate does not bode well for the Program's implementation, given that the Program's protocols do not require or anticipate supervision by agency personnel or experts. While the removal protocol in the Final EIS requires two "individuals" present to lethally remove a hybrid, only one has to be a removal specialist, and the other must be "[also] trained or experienced in the identification of hybrids." *See* AR 630. But there are no designation processes or any oversight or compliance procedures for this second individual. *Id.*

Ultimately, in the Final EIS, FWS amended the Draft EIS by providing an estimate for the anticipated number of accidental spotted owl deaths from the Strategy: one per decade. AR 494. The only support FWS provides for the proposition that accidental spotted owl kills will occur as infrequently as one per decade is the fact that no *known* accidental spotted owl deaths occurred during the prior removal experiments. *Id.* However, those removal experiments were conducted on a fraction of the Program's scale, with agency supervision and guidance, funding, and the participation of experts from prominent institutions. FWS' extrapolation from "zero known" to

"one per decade" is arbitrary, capricious, and not rationally tied to facts or evidence, in violation of the APA.

In the end, it is telling that the EPA remained alarmed enough about mistaken spotted owl shootings that it sent yet another letter of concern to the FWS *after* the publication of the Final EIS. AR 1590 (post-Final EIS EPA letter to FWS repeating concerns).

### 2. *FWS Failed to Adequately Evaluate Impacts to Marbled Murrelets*

Other than the spotted owl itself, the project's most significant risk to threatened wildlife is that to marbled murrelets. *See, e.g.*, AR 583 (marbled murrelets singled out as potentially impacted species in Final EIS). The marbled murrelet is listed under the ESA, and its habitat overlaps with barred and spotted owl habitat. AR 514. The Draft EIS anticipated the possibility of negative impacts on marbled murrelets from noise disturbance from shotguns, because marbled murrelets are sensitive to noise. *See, e.g.*, AR 7911.

Countless comments on the Draft EIS expressed concern about the impacts of disturbance to at-risk wildlife populations, including marbled murrelets specifically. *See, e.g.*, AR 6778 (Humane Society of the United States comment); 6759 (AWA and the Center comment); 6585 (Sierra Club); 6601 (North Central Washington Audubon Society); 06624 (Skagit Audubon Society); 6677 (Whatcom County Wildlife Advisory Committee members).

In the Final EIS, FWS provided additional information on the potential for disturbance impact on marbled murrelets, *see* AR 505, but did not correct the fundamental flaw with its analysis: a lack of evidence for its conclusions. FWS concluded that the Program could have an "overall potentially positive effect," and would not have a negative population-level effect,[3] by reasoning that any murrelet disturbance from noise would be not only balanced but potentially overcome by the reduction of barred owls as possible predators of marbled murrelets. *See, e.g.*,

---

[3] "Disturbance of nesting murrelets by the nearby discharge of shotguns could result in effects to individuals, but likely would have little to no effect on murrelet populations." AR 516.

AWA and the Center's
Mot. for Summary Judgement                   22

AR 511, 516, 583 (cumulative effects "are both positive and negative," because the adverse effect of harassment take will be balanced by reduced predation from barred owls).

But FWS cited to no evidence that barred owls prey, or even are "likely to prey," on murrelets. AR 511 (Final EIS stating, "[w]hile marbled murrelets have not been found in barred owl prey studies," "young marbled murrelets are likely vulnerable to opportunistic predation while in the nest," and providing no citation or study in support). Indeed, FWS admited that "we do not have sufficient monitoring data for these species to verify species-specific effects in most cases" when discussing the possibility of barred owls' impact on other species. AR 616. Scientists have expressed "concern" that the increase in barred owls "could" lead to cascading effects on the ecosystem and its food webs, *see* 616 (Final EIS), but there is no evidence that such trophic cascades or population impacts are, in fact, happening. Indeed, the published paper FWS used to support its statement, Holm et al. (2016), is wholly theoretical, referencing *other* examples of trophic impacts and studies of barred owl diets. *See* AR 39631-32. (The paper was nearly a decade old by the publication of the Final EIS; presumably, evidence of such ecosystem-wide impacts would have been observed by then, had they been true.) FWS itself admitted that "we have no hard evidence [murrelets] are barred owl prey." AR 511.

A Montana wildlife biologist specializing in barred owls submitted a comment that FWS' reliance on Holm et al. for supposed trophic cascades is misplaced. AR 6771 (noting, for example, that "[t]he eastern United States not only has multiple endangered salamander species that have yet to be driven extinct by the barred owl, but has the highest salamander diversity in the world. It also has small owl species that persist despite sharing habitat with the barred owl—I'm not convinced that the western screech owl is uniquely prone to barred owl depredations where the eastern screech owl is not.").

FWS' kneejerk desire to balance the positive and negative cumulative effects is unnecessary under NEPA. NEPA does not require, after all, that negative and positive effects be balanced; NEPA only requires that negative impacts be given a "hard look" so that the agency and the public be informed.

AWA and the Center's
Mot. for Summary Judgement                     23

However, *FWS regulations* prohibit the issuance of an MBTA permit if the activity would even "potentially threaten[] a wildlife or plant population." 50 C.F.R. § 13.21(b)(4). As a result, FWS felt the need to adopt an analysis of impacts to wildlife that "zeroes out" the adverse and beneficial effects on wildlife populations.

But the result of these analytic acrobatics was that FWS' analysis of impacts was arbitrary and capricious because it lacked an adequately "rational connection between the facts found and the choice made." *State Farm.,* 463 U.S. at 43 (1983).

### G. FWS Engaged in Unlawful Rulemaking by Creating a New Type of MBTA Permit without Providing Notice and the Opportunity to Comment

FWS violated the APA by creating a new type of MBTA permit to authorize action under the Program without going through notice-and-comment rulemaking. *See* AR 72529-32 and 380 (creating the "Agency Species Protection Permit" without a formal rulemaking process).

### 1. APA Requires Substantive Rules to Undergo Notice-and Comment Rulemaking

The APA requires that before an agency issues a rule, it must provide public notice and allow an opportunity for comment. 5 U.S.C. § 553. This requirement is "designed to assure due deliberation." *Smiley v. Citibank (S.D.),* 517 U.S. 735, 741 (1996). The failure to provide notice and allow for comment renders a rule invalid. *See, e.g.*, *Buschmann v. Schweiker*, 676 F.2d 352, 355 (9th Cir. 1982) (citations omitted). Following rule adoption, the APA requires an agency to publish in the Federal Register "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D).

An agency action is a substantive rule subject to the notice and comment requirement if it "effect[s] a change in existing law or policy, or remove[s] previously existing rights." *Linoz v. Heckler*, 800 F.2d 871, 877 (9th Cir. 1986).[4] In determining whether an action constitutes a rule,

---

[4] Notice and comment requirements do not apply to non-substantive rules that do not bind the public with the force and effect of law, such as rules governing internal "agency organization,

courts "must inquire into the substance and effect of the policy pronouncement." *Anderson v. Butz*, 550 F.2d 459, 463 (9th Cir. 1977). The label that an agency attaches to its action is "not controlling." *Id.*

### 2. At the Time of the Program's Development, No Existing MBTA Permit Authorized the Program's Activities

MBTA permits are the mechanism through which FWS may authorize an action that would otherwise be a violation of the MBTA's prohibition against take of migratory birds. *See* 16 U.S.C. §§ 703-704; 50 C.F.R. § 13.21 *et seq.* (governing issuance of permits under wildlife and plant protection laws administered by FWS); 50 C.F.R. § 21.2 *et seq.* (governing MBTA permits specifically). There are a number of distinct types of MBTA permits set out by regulation. *See generally* 50 C.F.R. § 21.63-21.100. These distinct permit types include depredation permits, scientific collecting permits, rehabilitation permits, and more. *Id.* Each of these types has its own specific rules for issuance. The last of these types is the "special purpose permit," which is a catch-all version designed to capture possible "special purpose activities…which are outside the scope of the standard form permits of this part." 50 C.F.R. § 21.95.

As described in detail in the Friends of Animals Motion, which AWA and the Center incorporate in full, none of the existing permit types would authorize the Program. *See* Friends of Animals Mot. 15.

### 3. FWS Initally Planned to Promulgate a Rule Creating a New Permit Type

During the project's development, FWS internally recognized that it would not be able to authorize action under the Program using a pre-existing MBTA permit. *See, e.g.*, AR 2764 (discussing and dismissing using a depredation permit); 20633-37 (internal document outlining FWS deliberation on different types of MBTA permits for the Program; included both "Special Purpose Miscellaneous Permit" and "Special T/E Protection Permit" as separate types of permit options; and indicated need to "create" the latter). Indeed, by 2020, FWS was already anticipating

---

procedure, or practice," "interpretative rules," and "general statements of policy." 5 U.S.C. § 553(b)(A). Another exception is for "good cause." 5 U.S.C. § 553(b)(B).

needing to adopt a rule creating a new type of permit to meet the Program's requirements. AR 20426 (internal notes from 2020 contemplating the need for a "[s]tand-alone regulation" to create a new "Threatened and Endangered [] (and at risk) species protection permit"); 20632 (December 2020 discussion about the potential creation of a new "Special T/E [Threatened/Endangered] Protection Permit," and stating, "this [new type of permit] is a new idea that while highly appropriate has not been fully vetted regarding the work involved and management support for an additional permit type."); *see also* AR 18830 (2021 email discussing a briefing on "the National MBTA Agency Species Protection permit," which did not yet exist; e-mail anticipated that "this [new permit] is the most likely way in which any management-focused barred owl removal will be authorized"); 20629 (discussing same or similar briefing, stating, "[t]he primary purpose for the call is to hear from Jennifer Miller on a potential new permitting mechanism to manage migratory birds for the conservation of listed species and to discuss it").

FWS initially planned to publish a draft rule establishing a new species protection permit by summer 2021, with the goal of publishing the final rule by summer 2022. *See* AR 20428 (internal document containing timeline). Even as late as May 2022, FWS was still anticipating the publication of a draft rule. AR 16838 ("Since the Agency Species Protection permit is still not out to the public, we have revised our language to refer to MBTA 'authorization' and not specifically permits. We can change this in the Draft EIS, and be more specific then, if we have the draft permit regulation published by then.").

However, FWS never proposed a rule to create the new permit type. Instead, it simply skipped over this crucial step. No explanation for this decision is reflected in the record.

### 4. *FWS Arbitrarily Decided To Skip Required Rulemaking Process*

By summer of 2023, FWS appears to have dropped plans for rulemaking, instead opting to issue a special purpose permit using a novel "approach." In a July 2023, a staff member from the Oregon Department of Fish and Wildlife asked a FWS employee for the "cliffnotes version" of the anticipated permitting approach, recalling that FWS "was exploring the development of a new

AWA and the Center's
Mot. for Summary Judgement                    26

permit type." AR 12006. Answered the FWS employee: "Currently, we are planning on using the Special Purpose permit, *with procedures for a[n] Agency Species Protection approach*." AR 12005 (emphasis added). The FWS employee did not explain why the agency was no longer contemplating rulemaking, but said it was "including the decision to issue a permit to the USFWS in the EIS and decision[.]" *Id.*; *see also* AR 11332 (August 1, 2023 document discussing requirement "for the issuance of the Special Purpose Agency Species Protection permit under the MBTA"). By February 2024, FWS had created an internal document to govern this new process. AR 72529-32.

Instead of engaging in the rulemaking required to create a new permit type, FWS relied on an existing permit type: the catch-all "miscellaneous" subtype of the special purpose permit.[5] FWS' actual permit application was for a special purpose miscellaneous permit. *See, e.g.*, AR 386 (application form); Attachment E to permit application at AR 1079.[6] The special purpose miscellaneous permit is designed to be "used on a case-by-case basis and can be very specifically defined." AR 20631; *see also* AR 72555 (April 2024 Migratory Bird Permitting Handbook). FWS documents show the agency's hesitation to use this permit in such a broad and extreme way, because it would "open the use of these [permits] to scrutiny." AR 20631; *see also* AR 20635 ("Need to consult further…regarding legal vulnerability [of special purpose miscellaneous permit]. Team uncomfortable with opening up plover predator control program permits if this approach receives a court judgment.").

Inexplicably, the "miscellaneous" special purpose Permit for which FWS applied, somehow morphed into a "Special Purpose Agency Species Protection Permit, Number: MBPER11461026." *See* AR 380 (FWS permit issued to permittee Oregon Office of FWS).

---

[5] This "Miscellaneous, Relocate, or any other activity" subtype is the last of twelve named subtypes special purpose permits. *See* AR 72555 (2024 MBTA Handbook § 3.1).

[6] This document is titled "BOMS draft permit application Section E," but the AR Index characterizes it as the actual attachment to the final submitted permit application. AR Index at 1, Dkt. 20-2.

AWA and the Center's
Mot. for Summary Judgement                    27

> 5. *New Permit Type Constituted a Rule Requiring Notice and Comment Rulemaking*

As FWS initially recognized, the creation of a new type of MBTA permit was a substantive rule that required notice-and-comment rulemaking. That FWS itself believed the Program would necessitate the creation of a new type of MBTA permit through rulemaking is, in itself, damning. But even without these internal records, it is plain to see that this Permit—a single permit that contemplates the take of up to half a million protected migratory birds, over three states and a thirty-year time span,[7] for the purpose of conserving another migratory bird species, and by means of audio lures—represents a significant change in existing MBTA policy and is of general applicability and force.

No other type of MBTA permit would authorize the desired activity. *See, e.g.*, AR 2764. Regulation prohibits the use of lures or bait, including audio, for lethal activities under depredation permits. 50 C.F.R. § 21.100(c)(3) ("Permittees may not use blinds, pits, or other means of concealment, decoys, duck calls, or other devices to lure or entice birds within gun range"). Despite the prohibition, the Program calls for the use of audio through megaphones to lure the target barred owl to the removal specialist. *See, e.g.*, AR 626.

Review of other permits supports the proposition that the Permit should have gone through formal rulemaking. Normal agency practice is strong evidence of how agencies interpret laws and regulations, and agencies must explain departures from those norms. *Atchison v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion) (describing "agency's duty to explain its departure from prior norms" and holding that when an agency departs from prior norms, its reasons "must be clearly set forth so that the reviewing court may understand the basis … and so may judge the consistency of that action with the agency's mandate"). Departure from long-standing practice without an explanation is arbitrary and capricious in violation of the APA. *See, e.g., Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007).

---

[7] The Permit itself only lasts three years, as general MBTA regulations mandate. However, the Permit anticipates successive renewals to encompass years 4 through 30. *See* AR 388. The Final EIS covers all 30 years of implementation.

AWA and the Center's
Mot. for Summary Judgement                    28

Large-scale control of specific migratory species is authorized through the following *regulations* under Title 50, Chapter 21, Subpart B, "Regulatory Authorizations for Migratory Birds":

- "Special Canada goose permit," 50 C.F.R. § 21.120;

- "Depredation order for blackbirds, cowbirds, crows, grackles, and magpie," 50 C.F.R. § 21.150;

- "Control order for muscovy ducks in the United States," 50 C.F.R. § 21.174;

- "Control order for invasive migratory birds in Hawai[']i," 50 C.F.R. § 21.177;

- And many more. *See generally* 50 C.F.R. § 21.13-21.55.

FWS even considered control and special permits like those listed above. *See* AR 20633-20637. It remains unclear why regulation like any of the above was ultimately not pursued.

### H. By Issuing the Permit, FWS Exceeded the Authority Granted under the MBTA and Violated Section 706(2)(C) of the APA

AWA and the Center incorporate in full the arguments provided in the Friends of Animals Motion, with the following additions.

The MBTA prohibits the killing of migratory birds "[u]nless and except as permitted by regulations." 16 U.S.C. § 703(a). In the words of Justice Holmes, the protection of migratory birds is "a national interest of very nearly the first magnitude," *Missouri v. Holland*, 252 U.S. 416, 435 (1920) (upholding the MBTA as a valid exercise of government authority).

The Secretary of the Interior "is authorized and directed, from time to time, having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow" killing of "any such bird." 16 U.S.C. § 704.

This power is not absolute, and agency authority is limited and cabined by the statutes under which authorities are granted. *See, e.g.*, *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321

(2014). The duty to interpret statutes is for courts, not agencies. *Loper Bright*, 603 U.S. at 391-92. This interpretation should account for both "the specific context in which . . . language is used, and the broader context of the statute as a whole," *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997), and must be consistent "with the design and structure of the statute as a whole." *See, e.g.*, *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 353 (2013). When an agency acts "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," the action can be set aside by courts. 5 U.S.C. § 706(2)(C).

The MBTA was never designed to allow a multi-decade endeavor to kill migratory birds *en masse* by use of a single permit. The authorizing language emphasizes that the determinations of when killing is permitted must occur "from time to time" and with "due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds." 16 U.S.C. § 704. Attention to contemporaneous biological ("distribution," "abundance," "times and lines of flight," "breeding habits"), climate ("zones of temperature"), and economic realities is necessary for these determinations. But a single permit that spans all three West Coast states and has up to a thirty-year recursive lifespan cannot, by definition, accomplish the requisite "due regard" to contemporaneous conditions—especially in a time of increasing environmental and ecological transformation from climate change.

## I.  FWS Violated Its Own Regulations in Issuing the Permit

The executive branch and its agencies must follow their own regulations. *United States v. Nixon*, 418 U.S. 683, 686 (1974). When an agency neglects to follow its own regulations, it violates the APA. *Confederated Tribes & Bands of Yakima Indian Nation v. F.E.R.C.*, 746 F.2d 466, 474 (9th Cir. 1984).

FWS and MBTA regulations mandate, in relevant parts, that permits may not be issued where the permitted action "potentially threatens a wildlife population," 50 C.F.R. § 13.21 (b)(4), and that MBTA permits specifically must include a "a delineation of the area in which [the permitted activity] will be conducted," 50 C.F.R § 21.95(b)(1).

AWA and the Center's
Mot. for Summary Judgement                    30

The Program does "potentially" threaten multiple wildlife populations, including marbled murrelets and spotted owls. *See supra* Part III(C). So too does the Program only provide broad outlines of where possible removals will or could occur. *See supra* Part III(C).

Permits to remove barred owls could avoid the "potential" to threaten wildlife populations if they are articulated with greater specificity and detail on removal sites, timing of removals (season-wise and day-wise), number and frequency of removals, and could sufficiently narrowly articulate removal areas. As is, however, FWS's Program fails to abide by its own authorizing regulations.

## III. CONCLUSION[8]

Plaintiffs respectfully ask the Court to vacate and remand the ROD, Strategy, Final EIS, and the Permit.

Dated February 19, 2026.

*/s/ Kate Chupka Schultz*
Kate Chupka Schultz, OR No. 221174
The Center for a Humane Economy
P.O. Box 30845
Bethesda, MD 20824
(858) 342-0398
kate@centerforahumaneeconomy.org

*/s/ Claire Loebs Davis*
Claire Loebs Davis, WA Bar No. 39812
Animal & Earth Advocates, PLLC
20520 105th Ave. SW
Vashon, WA 98070-
(206) 601-8476
claire@animalearthlaw.com

*/s/ Jessica L. Blome*
Jessica L. Blome, CA No. 314898
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

---

[8] AWA and the Center incorporate in full the arguments from the Friends of Animals Motion.

AWA and the Center's
Mot. for Summary Judgement                    31

## CERTIFICATE OF COMPLIANCE

In accordance with LR 7-2(a), the undersigned counsel of record, certify that this brief complies with the applicable word-count limitation set by the Court's Nov. 26, 2025 scheduling order, because it contains 10,974 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel. I relied on Microsoft Word to obtain the word count.

/s/ Kate Chupka Schultz
Kate Chupka Schultz

AWA and the Center's
Mot. for Summary Judgement                    32